THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD LANG, Defendant-Appellant.

(No. 57560;

First District (5th Division)—February 14, 1975.

David Lowell Slader, of Portland, Oregon, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Jerome Charles Randolph, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

Defendant, a deaf mute who was never taught to read or write or to use the sign language and was unable to communicate with anyone in any language, was, nevertheless, tried by a jury and found guilty of the murder of Earline Brown. He was sentenced to 14 to 25 years.

On appeal, it is contended (1) his conviction is constitutionally impermissible absent trial procedures to effectively compensate for his disabilities; (2) the evidence is insufficient to prove his guilt beyond a reasonable doubt; (3) he was denied a fair trial by the introduction of

incompetent and prejudicial evidence; and (4) the prosecutor's characterization of his attorney as a racist was plain error.

From the evidence, which was largely uncontested, it appears that defendant was seen leaving a tavern with Earline Brown, and a short time later they were observed entering and going to a room in the Viceroy Hotel. Within an hour or two thereafter, defendant was observed returning to the lobby of the hotel where he picked up and then hung up the house phone, after which he left the room key at the desk and left the hotel. The next day another couple discovered the body of Earline Brown stuffed in an upside-down position in the closet of the hotel room, with a large pool of blood under her body. She had been physically beaten about the head, face and chest. Death was determined to have been caused by asphyxiation. The hotel room had apparently been wiped clean of fingerprints.

Defendant was arrested the same day and, while in custody, the arresting officers observed what appeared to be blood spots on defendant's socks. A laboratory test of his clothing determined there were bloodstains on his pants and socks which were of the same blood type as deceased and dissimilar to defendant's own blood. In addition, minute green paint specks of similar chemical composition were found on defendant's pants and Earline Brown's clothing.

There was testimony that defendant had been employed for 12 to 13 years loading and unloading trucks; that he was "pretty strong," and could load and unload trucks by himself.

While defendant was in custody, one of the police officers attempted to communicate with him as to why he was being held. The officer testified that defendant took the pen from the officer's hand and made a drawing on a piece of paper on the table. The drawing consisted of a jagged line in the shape of a stick, and the officer stated that when defendant drew this stick figure he pointed to it and then pointed to himself. He then drew another figure on the other side and indicated, at least to the officer, that this was a woman. He then pointed to both figures and moved them up to the top of the jagged line, where he made an "X." He then indicated three fingers, pointed to himself with the three fingers, and then he pointed to the figure of the woman. He then crossed the woman out with another "X" and pointed to himself again. The following is a reproduction of the drawing made by defendant, which was admitted as an exhibit during his trial.

OPINION

The contention that defendant's conviction was constitutionally impermissible centers on the question of his competency to stand trial.

This was initially brought into focus in the case of *People ex rel. Myers v. Briggs,* 46 Ill.2d 281, 263 N.E.2d 109.[1] There, the same defendant was indicted in December, 1965, for the murder of a woman, accomplished in the same manner and in similar circumstances as the murder of Earline Brown in the instant case. In *Myers,* defendant was first found mentally and then physically incompetent to stand trial by separate juries. Judgments were entered on their verdicts and, pursuant to section 104—3(b) of the Code of Criminal Procedure (Ill. Rev. Stat. 1965, ch. 38, par. 104—3(b)),[2] he was committed to the Department of Mental Health until he became competent.

Two years later, Superintendent Edelson, of the Mental Health Institution where defendant was committed, concluded in a letter to the Department's attorney that:

> "[H]e will never acquire the necessary communication skills needed to participate and cooperate in his trial. He has rejected all our efforts to instruct him and has refused to participate and cooperate with his instructor. The probability for his acquiring the necessary communication skills at any future date is unlikely.

*   *   *

---

[1] The complete title is *The People ex rel. Lowell J. Myers, on behalf of Donald Lang v. John F. Briggs, Director of the Department of Public Health.*

[2] "§ 104—3. Commitment of Incompetent.

(b) A person who is found to be incompetent because of a mental condition shall be committed to the Department of Mental Health during the continuance of that condition."

It is apparent now that Donald's future must be decided in a court of law. He will not be able to communicate even in the limited sense as we had first anticipated."

Defendant's attorney, in *Myers*, then filed a petition for habeas corpus, contending that in effect defendant had been committed for life without ever having been given a trial. On appeal, after denial of the petition by the trial court, the Illinois Supreme Court held that defendant should have been given a trial, stating at page 288:

"This court is of the opinion that this defendant, handicapped as he is and facing an indefinite commitment because of the pending indictment against him, should be given an opportunity to obtain a trial to determine whether or not he is guilty as charged or should be released."

The case was then reinstated, but the State was unable to proceed to trial because of the death of its principal witness, and defendant was released.

It appears that no further action was taken concerning the physical or mental condition of defendant until his indictment in the instant case for the murder in July, 1971, of Earline Brown, following which the public defender moved for a competency hearing, and defendant was examined by the Psychiatric Institute of the Circuit Court. His condition was diagnosed as "mental retardation with emotional instability: * * * not competent to stand trial." However, no competency hearing was held. At trial, he was represented by the court appointed counsel who handled his appeal in the *Myers* case.

Thus, when the instant case was brought to trial in January, 1972, by virtue of the reasoning of *Myers*, defendant had the choice of being committed as he had been before, as being incompetent to stand trial, pursuant to section 104—1 *et seq.* of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 104—1 *et seq.*), or to stand trial. His attorney understandingly chose the risk of trial rather than the indicated life confinement as an incompetent.

The trial judge, required by *Myers* to allow defendant his choice of trial, was then confronted with the comment in *Myers* that procedures be provided to assure defendant's constitutional rights, as stated at page 287:

"The general rule in handling the trial of a criminal defendant who is handicapped by deafness, blindness or other affliction is that a trial judge should afford such a defendant reasonable facilities for confronting and cross-examining the witnesses as the circumstances will permit. He need only give such aid to intelligent appreciation of the proceeding as a sound discretion may suggest.

The fact of blindness or deafness of the accused may lessen the ability and capacity of the defendant to utilize his constitutional rights, but this will not prevent his being subject to trial. In the proper administration of justice, however, the court should give a person accused of crime a reasonable opportunity to obtain the benefit of his constitutional rights. If he is deaf, such opportunity as may be necessary should be allowed for communication to him of the testimony of the witnesses to insure him a full and fair exercise of his legal rights. The exact manner in which this result should be arrived at must depend on the circumstances of the case and, to a considerable extent, be left to the sound discretion of the court. 14 Am. Jur., § 181, p. 892."

This comment, at least to some extent, seemed to be based on certain other conclusions of Superintendent Edelson; namely, (1) it was his impression that, "Donald is functioning at a nearly normal level of performance in areas other than communication"; (2) "he is capable of fairly complex operations"; and (3) that his commitment "is based on physical and mental incompetence and the probability of appropriate functioning in the former area is doubtful."

Although the court in the above-set-forth comment referred to protective procedures in handling the trial of a defendant handicapped by deafness, blindness or other affliction, it gave no indication as to how a trial judge should conduct the trial of a defendant who could not communicate. Nevertheless, from our examination of the record, it is apparent that the very able trial judge here, insofar as was possible, conducted the trial in accordance with the *Myers* dictates, but it also appears quite clear that there were no trial procedures which could effectively compensate for the handicaps of a deaf mute with whom there could be no communication.

■■ It is also evident that defendant was incompetent to stand trial, as this phrase was then defined in section 104—1.[3] (Ill. Rev. Stat. 1971, ch. 38, par. 104—1.) In *Myers*, defendant had been found physically and mentally incompetent, and no action had been taken prior to the trial of the instant case to restore his competency. Under such circumstances, it is presumed that the conditions continue. (*People v. Santoro*, 13 Ill.App.3d 426, 301 N.E.2d 175.) Furthermore, after his indictment

---

[3] "§ 104—1. For the purpose of this Article, 'incompetent' means a person charged with an offense who is unable because of a mental condition:

(a) To understand the nature and purpose of the proceedings against him; or

(b) To assist in his defense; or

(c) After a death sentence has been imposed, to understand the nature and purpose of such sentence."

here, the Psychiatric Institute of the Circuit Court found him mentally retarded and incompetent to stand trial. Most significantly, the following admission of defendant's incompetence appears in the State's brief:

> "The defendant, Donald Lang, has been totally deaf since infancy. It was uncontested at his trial that he has always been unable to communicate in any manner save the most obvious of physical gestures. There can be no doubt that the nature and extent of the defendant's disabilities made it impossible for him to understand the nature of the charge against him or to assist his attorney with his defense."

That his incompetency was unquestioned is further indicated from the record, which discloses that his trial attorney stated in the motion for new trial that repeated efforts to communicate with defendant were futile; that the remaining members of defendant's family all testified they have never been able to communicate with him beyond the pantomime of simple requests; and that four counsellors and teachers of the deaf testified they were unable to achieve any meaningful communication with him.

In *Pate v. Robinson*, 383 U.S. 375, 15 L.Ed.2d 815, 86 S.Ct. 836, the United States Supreme Court held that the conviction of a defendant not competent to assist in his own defense violates due process unless there are compensating procedures to overcome his handicap. Later, that court, in *Jackson v. Indiana*, 406 U.S. 715, 32 L.Ed.2d 435, 92 S.Ct. 1845, held that the indefinite pretrial commitment of one permanently incompetent to stand trial violated his equal protection and due process rights, stating at page 738:

> "[T]hat a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant."

In view of the foregoing, we have reached a number of conclusions:

■■ 1. Although defendant's attorney chose the risk of trial for him rather than an indicated permanent confinement as an incompetent, we do not accept the State's contention that defendant should be bound by this choice. It was made by his attorney but, because of the lack of communication, it appears quite obvious that defendant could not have participated in the decision;

2. We disagree with the contention of the State that our inquiry should be directed toward the issue of whether the State's evidence is so strong that the possibility of rebuttal by a normal defendant would be so slight as to preclude any reasonable doubt of defendant's guilt. We believe that to review on such a basis would be in violation of the constitutional mandates of *Jackson, Pate* and *Myers,* which foreclose the trial and conviction of an incompetent criminal defendant unless procedures were devised to compensate for his disabilities;

3. Because of the total lack of ability to communicate with defendant, it appears that practical trial procedures could not be provided to compensate for his disabilities;

4. That absent such special trial procedures to negative the effect of his incompetency, he could not be constitutionally tried or convicted;

■■ 5. From our examination of the record, we disagree with the contention of defendant that the evidence was insufficient to prove his guilt beyond a reasonable doubt. There was positive identification of defendant leaving the tavern with Earline Brown and entering the hotel a short time later. There was also positive testimony that he came down from the room an hour or two later and was seen picking up the house phone, dropping the room key at the desk and then leaving the hotel. Her body was found in the room rented to them. In addition, there was testimony that she had been physically beaten which, in the opinion of Dr. Kearns, was by means of a blunt instrument such as a club or a fist. Furthermore, it was determined that the defendant had type "O" blood and deceased had type "B" blood, and that the bloodstains on defendant's clothing were of type "B." There was also testimony from hotel employees that no other persons were seen in the vicinity of the room, and that there was no screaming or loud talk heard coming from the room. We believe that the evidence was factually sufficient to support the charge.

Because required trial procedures were not provided as mandated by *Myers, Jackson* and *Pate,* the trial in the instant case was constitutionally impermissible, and the conviction of defendant must be reversed and the case remanded.

In view of the above conclusions, it will not be necessary to consider the remaining contentions of defendant (1) that he was denied a fair trial because of the admission of improper evidence; and (2) that a comment by the prosecutor that his attorney was a racist constituted plain error.

■■ This brings us to the question of the future disposition of the charge against defendant. In this regard, we note that the problems associated with the disposition of a defendant with whom there can be no

communication are difficult and complicated. Historically, the concept of incompetency to stand trial is an extension of the common-law ban against trials *in absentia*. At common law, it was believed that the incompetent defendant was mentally "absent" from the trial and would not be able to recall evidence or produce evidence that might acquit him or permit him to properly assume the role of defendant, and thus he would be deprived of his due process rights.

However, withholding a criminal trial until competent to stand trial, with the resultant possibility of permanent commitment, is more unfair to the incompetent defendant. This problem was recognized by the court in *Myers* but, as pointed out above, the court did not suggest or indicate the procedures that could be provided to protect defendant's rights. *Jackson*, although prohibiting the indefinite commitment of persons permanently unfit to stand trial or persons who will not be restored to fitness within a reasonable period of time, also left unanswered the question of the trial procedures necessary to effectively compensate for the inability to communicate.

In Illinois, it is apparent that the legislature was cognizant of the problem from its repeal of section 104—1 *et seq.* of the Code of Criminal Procedure, in effect at the time of defendant's trial, which provided, among other things, that a person not competent to stand trial because of a mental condition "shall be committed to the Department of Mental Health during the continuance of that condition."

Replacing that section, as of January 1, 1973, is section 5—2—1 *et seq.* of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1 *et seq.*).

Subsection (a) thereof provides that a defendant is unfit to stand trial or to be sentenced if, because of a mental or physical condition, he is unable:

> "(1) to understand the nature and purpose of the proceedings against him; or
>
> (2) to assist in his defense."

We note also that the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402, 402, 4 L.Ed.2d 824, 825, 80 S.Ct. 788, stated the test for determining competency to stand trial as follows:

> " '* * * [W]hether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "

Here, it appears that defendant presently remains incompetent to stand trial because (1) he was found to be mentally and physically in-

competent in *Myers* and, no restoration action having been taken, there is a presumption that the conditions continue (*Santoro*); (2) the record clearly establishes the past inability to communicate with defendant; and (3) the State has admitted in its brief that "there can be no doubt that the nature and extent of defendant's disabilities made it impossible for him to understand the nature of the charge against him or to assist his attorney with his defense."

It might be said that there remains no question as to defendant's incompetency to stand trial and, indeed, that this court could so find and, on remandment, that we should direct that he be hospitalized under the provisions of section 5—2—2, which, among other things, provides in subparagraph (a) that "the court shall remand the defendant to a hospital, as defined by the Mental Health Code of 1967,[4] and shall order that a hearing be conducted in accordance with the procedures, and within the time periods, specified in such Act." However, we will not direct this course of action, for the following reasons:

(1) There is the possibility that his condition may have improved to the extent that he may not now be unfit to stand trial, in which event compensating trial procedures should be devised for his retrial if any disability remains;

(2) There has been no finding of defendant's unfitness to stand trial, as defined in subparagraph (a) of section 5—2—1 of the Unified Code of Corrections, which replaced the defining section in effect at the time of his trial; and

(3) There has been a change in the language from "incompetence" to stand trial "because of a mental condition" in the repealed section to "fitness" to stand trial "because of a mental or physical condition." The Council Commentary (S.H.A., ch. 38, par. 1005—2—1) states that, "Fitness speaks only to a person's ability to function within the context of trial, whereas the term 'competence' is a mental health term dealing with whether an individual should be committed to an institution or not, and excludes consideration of physical fitness."

Subsection (c) of section 5—2—1 provides that "when a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings."

■■ Here, it is our opinion that a bona fide doubt exists as to defen-

---

[4] Ill. Rev. Stat. 1973, ch. 91½, par. 1—1 *et seq.*

dant's present fitness to stand trial and that a new hearing should be held. Therefore, we direct, on remandment, that the trial court order a determination of that question, as provided in section 5—2—1. Thereupon, if defendant is found fit for trial, he shall be retried with procedures provided to compensate for existing disabilities, if there be any, as required by *Myers, Jackson* and *Pate*. If he is found unfit, the trial court shall proceed in accordance with the provisions of section 5—2—2. Thereafter, if he should be found fit for trial, methods should be provided to compensate for any disabilities.

The concern of the State, in view of the strong circumstantial proof of murder here and because he was allegedly a murderer in *Myers* (both murders were accomplished in the same manner and in similar circumstances), that defendant might be released and thus present a potential danger to society should be allayed, because (1) under the present Mental Health Code, he could be institutionalized if (a) he is found to be a person in need of mental treatment, as defined in section 1—11 of the Mental Health Code, or (b) if he is found to be mentally retarded, as defined in section 1—12; and (2) that although subsection (a) of section 5—2—2 of the Unified Code of Corrections provides that the question of whether to institutionalize is determined at a civil commitment hearing under the Mental Health Code, subsection (b) provides for review at stated intervals by the trial court of the issue of continued hospitalization.

██ It would appear that subsections (b) and (c) of section 5—2—2 were intended by the legislature to remove the possibility of the permanent commitment of an incompetent defendant. As we stated above, subsection (b) provides for periodic review of the commitment issue and subsection (c) limits any possible confinement in a mental health institution to the maximum sentence that could be imposed for the offense charged and provides for dismissal when that term is reached. It is noted that section 5—8—1 of the Unified Code of Corrections provides that the maximum term for murder shall be "any term in excess of 14 years." It should also be noted that *Jackson* requires that the commitment of an incompetent defendant should be for only a "reasonable" length of time and should be justified by progress toward restoration. *Jackson* did not set any standard as to what would be reasonable, leaving it to the facts and circumstances of each particular case and, in the instant case, if defendant is confined, it will only be after periodic reexaminations by the trial court that the question of the reasonableness of the length of his confinement may be determined.

In any event, we are of the opinion that the procedures outlined above

satisfy, although minimally,[5] the requirements of *Myers, Jackson* and *Pate* and, having reversed the conviction, we remand with directions that action be taken consistent with the content of this opinion.

Reversed and remanded with directions.

DRUCKER and LORENZ, JJ., concur.

---

[5] We understand that mental health problems are presently under study by the Governor's Commission for Review of the Mental Health Code in Illinois. This Commission, chaired by Judge Joseph Schneider, is considered to be eminently qualified in this field. It is hoped that their study and recommendations will include the difficulties occasioned in the disposition of charges against incompetent criminal defendants.