363 So.2d 441 (1978)
STATE of Louisiana
v.
James WILLIAMS.
No. 61772.
Supreme Court of Louisiana.
October 9, 1978.
Brian Perry, New Orleans, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William L. Brockman, Asst. Dist. Atty., for plaintiff-respondent.
SUMMERS, Justice.
On June 26, 1975 James Williams was indicted by the Grand Jury of Orleans Parish for aggravated rape, alleged to have been committed on June 14, 1975. La.Rev. Stat. 14:42. The record sheds little light on the circumstances surrounding this charge save that set forth in the arrest register. From this source we learn that the offense occurred in the city of New Orleans at 4:45 a. m. on June 14, 1975. Williams was arrested approximately eight hours later and positively identified by the victim. The weapon used was a knife.
The accused was represented by counsel, who alleged in a motion on July 28, 1975 that Williams was apparently deaf and dumb and he was therefore unable to communicate with his counsel and that testing was necessary to ascertain his true physical state. Accordingly on the same day the trial judge ordered the sheriff to transport Williams to the Louisiana State University Medical Center in New Orleans, Department of Audiology and Speech Pathology.
On August 1, 1975 the LSU Speech and Language Clinic reported to defendant's counsel. The report set forth:
"This 22 year old man was seen at the LSU Medical Center Speech and Language Clinic on July 31, 1975 for speech and language evaluation to determine communication deficits secondary to hearing loss. He currently is detained at Orleans Parish Prison charged with aggravated rape.
History
"Mr. Williams was brought to this Clinic by a prison deputy, but his mother and several brothers and sisters also came to the appointment and were helpful in providing background data.
"The mother reported that her pregnancy with this child was full term and uncomplicated. Medical history, as reported by the mother, is essentially negative. There is no family history of hearing disorders.
"Mrs. Williams could give no reason for her son's loss of hearing, other than to state that he has always had trouble hearing and talking. He communicates with his family primarily by primitive gestures, supplemented by vocalizations and some word approximations.
"Mr. Williams reportedly has had no school experience. His older brother reported *442 that an uncle in Hattiesburg had wanted to get speech and hearing help for the boy years ago, but that his mother had resisted. Mrs. Williams said James' hearing was tested in Tuscaloosa, Alabama and that a hearing aid was recommended, but she had never gotten one for him because of Welfare complexities. Mrs. Williams also reported that James had undergone testing that, from her description, may have been an intelligence test, at about age 13 in Birmingham, Ala., but she had no recollection of the results or recommendations.
Examination
"Mr. Williams entered the testing situation willingly and was cooperative throughout. His relation to common objects and environmental orientation appeared normal.
"Language testing indicated severe deficits. He did not respond to speech appropriately, could not identify most named objects, and could not follow simple one-part instructions, unless they were accompanied by gestures. He demonstrated no understanding of deaf sign language. He named some common objects verbally, using word approximations, and used a few verbs. When asked to describe story-action pictures he employed primarily single words and unintelligible jargon, interspersed with real-word approximations. He employed a voice of normal quality and loudness but lacking in the pitch inflections of connected speech.
"Mr. Williams verbally counted objects only up to 7 and demonstrated mental addition and subtraction abilities up to seven; i. e., 5 take-away 3 = 2, 5 plus 2 = 7. He did not understand the examiner's verbal request for certain numbers of objects ("Give me 3, Give me 5"), but did understand when the examiner held up the number of fingers to indicate how many were wanted. Mr. Williams matched colors correctly but did not understand or use color names.
"Reading and writing skills are non-functional, except to print his name.
"A short time was spent in trial teaching of sign language vocabulary. In less than ten minutes he had learned to understand and use five noun words and three color words in sign language, indicating good potential for development of communication through this modality.
"A clinical examination of the intraoral speech mechanism including the tongue, lips, hard palate, velum and dentition revealed no structural or functional abnormalities which would be likely to interfere with speech or voice production.
"An audiometric testing of hearing sensitivity in our Audiology Clinic revealed a severe, bilateral sensorineural hearing loss.
"In response to the examiner's request that he draw a man, the patient produced a figure with skill and conceptualization at the eight year, six month level of the Goodenough norms.
Impressions
"Mr. Williams displayed severe communication deficits in all modalities, including speech, oral language comprehension and expression, sign language, reading and writing. He communicates primarily with primitive gestures, unintelligible jargon and a few word approximations. Lipreading is essentially nonfunctional.
"He demonstrated potential for development of some speech if provided with hearing aid amplification and for development of sign language communication if intensive tutoring is made available.
Recommendations
"1. Psychological testing to determine intellectual potential so that realistic goals can be set for Mr. Williams.
"2. Speechk English language, and sign language training at our facility, in conjunction with hearing aid fitting and auditory training.
"3. It is recommended that members of his family also learn sign language, possibly in classes offered at the Catholic Deaf Center."
An August 4, 1975 report of the Audiology Clinic was also furnished in which this audiological evaluation was made.

*443 "Audiological Evaluation

"James was seen at the Audiology Clinic, LSU Medical Center on July 31, 1975 for a hearing evaluation. The evaluation had been ordered by criminal authorities regarding his arrest and prosecution on criminal charges.
"Results of pure tone air and bone conduction testing indicate that James has a severe hearing loss in the right ear and a severe to profound hearing loss in the left ear. The loss appears to be primarily sensorineural in nature. Speech awareness thresholds of 60dB HL for the right ear and 75dB HL for the left ear correlated well with the pure tone thresholds.
"Impedance evaluation revealed a normally functioning right middle ear system and a slightly stiff left middle ear system.
"Stapedial reflexes were elevated when stimulating the right ear and were even more elevated or absent when stimulating the left ear. These results are very likely indicative of recruitment rather than true sensitivity levels. Further testing was impossible due to the patient's inability to understand complex verbal instructions. Otoscopic examination by Dr. Fourier, M.D. revealed some patches of plaque on the left ear drum, but it was felt that it not medically significant in relation to the total severity of the problem.
"In summary, James Williams has a severe hearing impairment. His loss appears to have been present very early in life and is primarily responsible for his inability to use normal verbal communication himself or understand normal verbal communication directed to him by others unless the communication situation is very basic or familiar.
"Based on the above results, the following recommendations were made:
1. That he be fitted with a high gain hearing aid in the right ear as quickly as possible. Private purchase does not appear feasible and it will probably be necessary for some family assistance program to handle this matter.
2. That he be seen for a hearing aid evaluation at this clinic as soon as a hearing aid is procured.
3. That he be enrolled in an aural rehabilitation/speech therapy program at this clinic.
"It should be noted that simply supplying a hearing aid will not remedy James' communication problems. The many years of inadequate or absent treatment for his hearing loss have produced severe delays in speech and language development and cannot be quickly reversed or dismissed through simple hearing aid use. Therefore, the recommendation for aural rehabilitation therapy is a major requirement in the management of this case."
Orders were issued thereafter requiring defendant to be examined on a continuing basis and that he be fitted with a hearing aid. This progress report was sent to the trial judge on May 10, 1976:
"Progress Report

"Diagnosis: Communication deficit secondary to hearing loss.

Additional Information: Total communication therapy was initiated in February, 1976, for two one-hour sessions weekly.

Objectives: Development of communicative abilities adequate for participation in trial proceedings.

Procedures: Total communication therapy, employing oral-aural stimulation via an auditory trainer and American Sign Language was used. Procedures were aimed at enhancing James' ability to understand spoken language, to speak more intelligbly, and at the same time, teaching him to understand and use sign language.

Progress and Present Status: In the 6 sessions he attended, James learned to speak, sign and understand signs for 12 nouns, 13 adjectives, 3 pronouns, and 6 verbs. In addition, he has learned to count to 10 in sign language and to enunciate the numbers more clearly. Overall intelligibility remains low. Intelligibility of target responses is about 50%. James is able to follow simple instructions involving target responses with 80% accuracy.

*444 Comments: James learned the concept of sign language quickly. He was cooperative and was progressing rapidly in therapy. However, following at attempted escape from Charity Hospital in late February, 1976, James was returned to Parish Prison. Since that time there have been no arrangements made by the sheriff to have James returned to Charity for continuation of therapy, despite our repeated contacts with Mr. Weil, the medical officer at Parish Prison.
"At this time, James' communicative abilities remain severely deficient.
Recommendations: James should be returned to Charity Hospital for resumption of therapy."
Apparently, because of his attempted escape, Williams was no longer permitted to attend the therapy sessions on a regular basis. Furthermore, according to the experts, he was not benefitting significantly from the therapy program. In their opinion his condition required an intense full-time aural rehabilitation program to produce any significant improvement in his communicative abilities. That service could not be provided in Louisiana. An effort to arrange for Williams to participate in such a program with the Crossroads Rehabilitation Center in Indianapolis, Indiana, was unsuccessful because that facility could not provide the security required for a person under a felony indictment involving a violent crime.
Under the circumstances the LSU Department of Speech and Pathology was of the opinion on September 30,1977 that further therapy on a limited basis would be useless because that department could not supply the intense program considered necessary for Williams. Under the circumstances, the Department was of the opinion that Williams' communicative disability would continue indefinitely and he would be incapable of standing trial in the future as he was when he was charged.
Then, on December 12, 1977, Williams through counsel, alleged in a motion that he was incarcerated in the Orleans Parish Prison, that he had been found incompetent to stand trial, medical testimony indicated there was no likelihood of his condition improving in the foreseeable future, and he was deaf and dumb, unable to read or write and did not know, and apparently could not be taught, any form of meaningful communication. For these reasons, it was alleged, it was impossible for Williams to assist his attorney in his defense. Therefore, the motion concluded, the State was obligated to dismiss the indictment against Williams or move to civilly commit him, or show cause to the contrary.
In its answer to the motion the State asserts that Williams, a deaf mute, would be a danger to himself and others if he were released. Further, the answer alleges that the State knew of no statutory or codal authority which provides for the civil commitment of a defendant suffering from such a physical defect and the State knew of no institution capable of improving defendant's communicative abilities and providing necessary security while doing so.
After a hearing on December 12,1977 the trial judge denied the motion. Defense counsel applied for certiorari and the writ was granted. 355 So.2d 941 (La.).
It is the State's position that the record does not indicate that psychological tests have been administered to determine whether Williams suffers from mental disease or mental retardation. In addition, it is the State's belief that Williams could respond to proper intensive therapy to develop his communicative ability. At the same time, the State concedes that such treatment is not presently available in Louisiana. Therefore, the State contends that under the peculiar circumstances of this case the motion to release or civilly commit is premature at this time. Instead, it is contended the case should be remanded to the district court for further inquiry into Williams' mental condition as distinguished from his physical condition.
There are provisions in our law for the judicial commitment of persons who are mentally ill or gravely disabled. La.Rev. Stat. 28:54. The alternatives available are to either release this defendant, who is *445 charged with a violent crime, or remand to permit inquiry into his mental illness for which treatment is available. Faced with the proposition that no one is beyond the reach of the law, the choice must be resolved, at least at this time, in favor of the State's request for additional time to have Williams tested psychologically. Ultimately, even if he is found to be mentally ill, he cannot be held indefinitely on that account if his condition is incurable. If he is mentally ill and responds to treatment, however, and if his communicative ability can be improved to the point where he can assist his counsel in his defense, he can be tried; provided these restorative procedures can be accomplished without delay. Otherwise the State must release Williams. Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); State ex rel. Lockhart v. Armistead, 351 So.2d 496 (La. 1977); People v. Lang, 325 N.E.2d 305 (Ill.App.1975); People v. Myers, 263 N.E.2d 113 (Ill.1970); "The Strange Case of Donald Lang", ABA Journal Vol. 64, p. 1178 (Aug. 1978).
For the reasons assigned, the case is remanded to the trial court to be proceeded with in accordance with the reasons assigned.