THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD LANG, Defendant-Appellant.—(ROBERT A. deVITO, M.D., Director, Illinois Department of Mental Health and Developmental Disabilities, Respondent-Appellant.)

First District (2nd Division)   Nos. 77-1541, 78-250 cons.

Opinion filed June 20, 1978.—Rehearing denied August 1, 1978.

James J. Doherty, Public Defender, and Epstein & Kesselman, both of Chicago (Nancy M. Joslyn, Kenneth L. Fletcher, and Donald Paull, Assistant Public Defenders, and Mark B. Epstein, of counsel), for appellant Donald Lang.

William J. Scott, Attorney General, of Chicago (William J. Fitzpatrick, Assistant Attorney General, of counsel), for appellant Robert A. deVito, M.D.

Bernard Carey, State's Attorney, of Chicago (Michael E. Shabat and Timothy Szwed, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

This is yet another case affecting the deaf-mute, Donald Lang (defendant), who until quite recently was never trained to communicate in any recognized language system. (See *People v. Lang* (1967), 37 Ill. 2d 75, 224 N.E.2d 838; *People ex rel. Myers v. Briggs* (1970), 46 Ill. 2d 281, 263 N.E.2d 109; *People v. Lang* (1st Dist. 1975), 26 Ill. App. 3d 648, 325 N.E.2d 305, *cert. denied* (1976), 423 U.S. 1070, 47 L. Ed. 2d 80, 96 S. Ct. 851.) In appeal No. 77-1541, Robert A. deVito, M.D., Director of the Illinois Department of Mental Health and Developmental Disabilities (Director), appeals from the circuit court's issuance of a writ of mandamus against him. In appeal No. 78-250, defendant's attorneys (Public Defender) appeal from an order denying a petition for a writ of

habeas corpus. We consolidated the cases on appeal in order to expedite a final disposition of the extensive litigation.

On July 26, 1971, defendant was indicted for murder (Ill. Rev. Stat. 1969, ch. 38, par. 9—1); and in January of 1972, he was convicted of that crime and sentenced to 14 to 25 years imprisonment. On February 14, 1975, we reversed the judgment because defendant's conviction was secured in the absence of trial procedures effectively compensating for defendant's disabilities. (26 Ill. App. 3d 648, 655.) We remanded the cause with directions that defendant's fitness to stand trial be determined pursuant to section 5—2—1 of the Unified Code of Corrections (hereinafter UCC) (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1)[1]. On March 25, 1975, defendant was found unfit to stand trial and was remanded to the Illinois Department of Mental Health and Developmental Disabilities (Department) for a hearing into his need for hospitalization. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2.)[2] Thereafter on December 8, 1976, defendant was found not in need of mental treatment and not mentally retarded, as those terms are defined in the Mental Health Code (hereinafter MHC). Ill. Rev. Stat. 1975, ch. 91½, pars. 1—11, 1—12.

In addition to finding defendant not in need of hospitalization, the court also imposed certain special conditions on bail: (1) that defendant continue in the Department's training program designed to teach him communication skills with the goal of rendering him fit to stand trial; and

---

[1] Section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1(a)) provides:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:
    (1) to understand the nature and purpose of the proceedings against him; or
    (2) to assist in his defense."

[2] Section 5—2—2(a), (b) of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a), (b)) provides:

"(a) If the defendant is found unfit to stand trial or be sentenced, the court shall remand the defendant to a hospital, as defined by the Mental Health Code of 1967, and shall order that a hearing be conducted in accordance with the procedures, and within the time periods, specified in such Act. The disposition of defendant pursuant to such hearing, and the admission, detention, care, treatment and discharge of any such defendant found to be in need of mental treatment, shall be determined in accordance with such Act. If the defendant is not ordered hospitalized in such hearing, the Department of Mental Health and Developmental Disabilities shall petition the trial court to release the defendant on bail or recognizance, under such conditions as the court finds appropriate, which may include, but need not be limited to requiring the defendant to submit to or to secure treatment for his mental condition.

(b) A defendant hospitalized under this Section shall be returned to the court not more than 90 days after the court's original finding of unfitness, and each 12 months thereafter. At such re-examination the court may proceed, find, and order as in the first instance under paragraph (a) of this Section. If the court finds that defendant continues to be unfit to stand trial or be sentenced but that he no longer requires hospitalization, the defendant shall be released under paragraph (a) of this Section on bail or recognizance. Either the State or the defendant may at any time petition the court for review of the defendant's fitness."

(2) that defendant reside in a secure setting to insure the continuity of his training and his appearance in court. The court concluded that the State had a critical interest in defendant's training and, therefore, ordered the Department to collaborate with the Public Defender in developing both an appropriate training program and an appropriate living arrangement. Pending further order of court, defendant was directed to continue his residence at the security unit at the Illinois State Psychiatric Institute (ISPI), a Department facility.

On February 18, 1977, the Department petitioned for defendant's release from ISPI on bail or recognizance. A month later the court's order requiring the Department to hold defendant was vacated and the Public Defender applied to the Department for defendant's voluntary admission. Defendant was then accepted in that status at ISPI where his temporary training in sign language continued. Between December of 1976 and October of 1977, the court conducted an extensive bail hearing in order to ascertain the necessary conditions of bail. In the course of such hearing, the parties were investigating various programs across the nation which would accept defendant in a permanent training program. Defendant's brother, Julius Lang (Conservator), also became involved in the bail hearing: initially as the conservator of defendant's estate and later as the conservator of defendant's estate and person.

In September of 1977, the Department informed the court that it had decided to discharge defendant and release him to the custody of the sheriff of Cook County. The Conservator and the Public Defender then obtained a temporary restraining order preventing such discharge. On October 3, 1977, the court issued an oral opinion dissolving the temporary restraining order. The next day the Department released defendant to the sheriff's custody and defendant was taken to the jail where he still remains. By the October 3 order (reduced to writing on October 11, 1977), the court issued a writ of mandamus against the Director, commanding him to "create and implement an adequate and humane care and treatment program for Donald Lang." The Director now appeals from the order and from an order which denied his motion to vacate, alter or amend the prior order. We granted the Director's motion for a stay of the order requiring him to develop a program.

While the Director was perfecting the appeal in 77-1541, the proceedings below continued. On October 19, 1977, the Public Defender filed a motion to quash the warrant and bar further prosecution, a petition for writ of habeas corpus, and a motion to modify the conditions of bail. On October 24, 1977, the court set defendant's bail in the amount of $50,000, which could be executed by the Conservator. The conditions of bail set forth in the orders of December 8, 1976, and October 11, 1977, were to be superseded by the condition that within 30 days of his release

on bail defendant was to be placed in a training program designed to help render him fit to stand trial. Lastly, the court entered an order, later stayed, for a rule to show cause why the Director should not be held in contempt for his failure to obey the earlier order commanding him to create and implement a training program.

On November 29, 1977, the trial court denied the motions and petitions filed by the Public Defender. The court acknowledged that since the time of its denial of an earlier petition for a writ of habeas corpus, defendant had been transferred to the jail where all training had ceased. As bail had been set in an amount which the Conservator could provide, the court maintained that the only restraint upon defendant was the Conservator's "unwillingness to post bail without a suitable living arrangement." On defendant's behalf, the Public Defender now appeals in 78-250 from the court's denial of the petition for a writ of habeas corpus.

The issues presented by these appeals may be reduced to the following: (1) whether the court conducted the bail hearing properly; (2) whether the court had the authority to order the Department to retain custody of defendant; (3) whether the court had the authority to order the Director to develop and implement a training program for defendant; (4) whether the court had the authority and jurisdiction to enter a writ of mandamus against the Director and, if the court was so authorized, whether the entry of the writ was permissible upon the facts; (5) whether the court erred in denying the petition for a writ of habeas corpus; and (6) whether the court erred in refusing to dismiss the indictment against defendant.

## I.

We note at the outset that the Director has challenged the method by which he was brought into the mandamus action. He contends that the court never acquired jurisdiction over him because the petition for mandatory injunction was filed by the Conservator who was not a proper party to the proceedings, and, because the petition was filed against the Governor of Illinois and the State's Attorney of Cook County, but not the Director himself. A limited chronological review of the case below is necessary to understand the court's issuance of the mandamus.

From December of 1976 to October of 1977, the court held a lengthy hearing with the object of setting the terms and conditions of defendant's release on bail. The determination of such special condictions was complicated by the unique nature of defendant's disabilities, his history of alleged violence, the conflict in the expert testimony proffered and the inability to locate a program which provided the necessary training and suitable security. Although the Department had accepted defendant as a voluntary admission to ISPI, the Department made clear that it did not believe defendant belonged in that facility. The Department's single

suggestion was defendant's placement in a facility which housed mentally retarded individuals. That suggestion ignored the finding that defendant is not mentally retarded and that he becomes irritable when housed with those who are. Simultaneously, the Public Defender was investigating programs in Illinois, Wisconsin, Maryland, the District of Columbia, and Indiana, which would offer defendant both the specialized training he needs and a therapeutic living environment.

In the course of the bail hearing, on February 18, 1977, the Public Defender suggested that in order to further investigate a program with the Illinois Division of Vocational Rehabilitation, it would be advisable to have representatives of the Social Security Administration, the Department of Public Aid, and the Conservator appear in court. The Conservator was subpoenaed, and on May 4, 1977, the court called him as the court's witness. The Conservator explained that he was at that time conservator of defendant's estate and would be willing to become conservator of defendant's person. The Conservator said that he had always assumed that he had authority of defendant's person also. On June 8, 1977, an attorney appeared for the first time in the proceedings as the Conservator's counsel. On July 12, 1977, the attorney appeared and tendered an order stating that the Conservator had been appointed conservator of defendant's person. The Conservator also testified on that date that he was prepared to take defendant home even though no one from the Department had ever talked to him about the possibility during the three or four year period when he had been conservator of defendant's estate.

Commencing from that point in the proceedings, the Conservator's attorney represented the Conservator and filed motions. On September 22, 1977, the Department moved to strike all of the Conservator's pleadings up to that point "which in any way concern the bail or recognizance hearing." In particular, the Department wanted the Conservator's amended petition for a preliminary injunction stricken. The Conservator and the Public Defender had petitioned for and obtained an order temporarily restraining the Department from discharging defendant to the sheriff of Cook County. The court found that irreparable harm would result if defendant were forced to leave ISPI before an evaluation team arrived from an Indiana institute. On September 23, 1977, the temporary restraining order was continued in effect pending the resolution of various motions and petitions before the court. They included the Conservator's petition for mandatory injunction and the Governor's special and limited appearance and motion to strike and dismiss the petition. The trial court did not rule upon the latter. On October 11, 1977, the court dissolved the temporary restraining order, denied the Department's motion to strike the Conservator's pleadings,

and issued the writ of mandamus against the Director of the Department.

■■■ In view of this sequence of events, we cannot say that the trial court lacked jurisdiction to enter a writ of mandamus. We think the Conservator was proper party to the proceedings. Although the Director argues that the court erred in deviating from the strict format of the bail hearing being conducted, we disagree. In our opinion the State and defendant were not the only real participants in this bail hearing. We are not persuaded by the Director's bald assertion that section 5—2—2 of the UCC bars the admission of other parties. The record clearly reflects that the trial court was aware of the unusual hearing being conducted and the necessity of having all affected persons before it. The conduct of the proceedings was in accord with section 25 of the Civil Practice Act, which provides in part, "[i]f a complete determination of a controversy cannot be had without the presence of other parties, the court may direct them to be brought in." (Ill. Rev. Stat. 1975, ch. 110, par. 25(1).) Here the Conservator had control over defendant's estate and later his person. Defendant's placement in some of the suggested programs could have required the Conservator's authorization for the disbursement of funds or the Conservator's assessment of defendant's finances. Furthermore, the eventual setting of bond in the amount of $50,000 demonstrates the need for the Conservator's presence in order to meet the stated sum. We conclude, therefore, that the Conservator's presence was needed for a complete determination of the hearing, and that the trial court committed no error in admitting him to the proceedings.

■■■ The Director's contention that the trial court lacked jurisdiction because the Director was not properly before the court is also without merit. Pursuant to section 11 of "An Act to revise the law in relation to mandamus," the provisions of the Civil Practice Act apply to mandamus proceedings. (Ill. Rev. Stat. 1975, ch. 87, par. 11; see also *People ex rel. Commissioners v. Dixon* (1931), 346 Ill. 454, 460, 178 N.E. 914.) Generally, anyone interested in the subject matter of a mandamus action may be brought in as a party or may intervene. (26 Ill. L. & Prac. *Mandamus* §127 (1956), citing section 25 of the Civil Practice Act, Ill. Rev. Stat. 1975, ch. 110, par. 25.) All persons should be made parties who are legally or beneficially interested in the subject matter of the litigation, and who will be affected by the decree, so as to enable the court to dispose of the whole controversy. (*Oglesby v. Springfield Marine Bank* (1944), 385 Ill. 414, 423, 52 N.E.2d 1000; *Riley v. Webb* (1916), 272 Ill. 537, 538-39, 112 N.E. 340; *Nolan v. Barnes* (1915), 268 Ill. 515, 523, 109 N.E. 316.) In a proceeding for mandamus, when a party is shown by the petition to have a legal interest in the right or duty sought to be enforced by the writ, and that the

rights of such party will be collaterally determined by the judgment if rendered as prayed in the petition, the cause should not be adjudicated until such party is made a respondent thereto, when he is shown to be within the jurisdiction of the court. *Powell v. People ex rel. Hedrick* (1905), 214 Ill. 475, 479, 73 N.E. 795; *People ex rel. Bradford National Bank v. School Directors* (4th Dist. 1941), 309 Ill. App. 242, 249-50, 32 N.E.2d 1008.

Although the Conservator's petition for mandatory injunction named the People of the State of Illinois, the Governor and the State's Attorney as respondents, part of the relief sought was a mandatory injunction requiring the People as represented by the State's Attorney and Governor to "develop a program (within the guidelines to be set for his release on bail or recognizance) for Donald Lang which holds out a substantial likelihood that he will be given the opportunity to acquire fitness to stand trial within a reasonable time." Any such relief had to be provided by the Department and its Director as representatives of the executive branch of the State government under the Governor. We interpret the court's action in this respect as one whereby he joined the Director and then issued the relief requested against the respondent most able to provide it.

Regardless of what his position in the proceedings is denominated, the Director should have a critical interest in the ultimate disposition of the defendant, Donald Lang. A complete determination of the petition for mandatory injunction could not be had without his presence. (Ill. Rev. Stat. 1975, ch. 110, par. 25.) Therefore, the Director was a "necessary respondent" (*Powell*, at 479); a "necessary party" (*In re North Country Development Corp. v. Massena Housing Authority* (1970), 316 N.Y.S.2d 894, 897, 65 Misc. 2d 105); the "real party in interest" (*Martin v. County of Contra Costa* (1970), 8 Cal. App. 3d 856, 865-66, 87 Cal. Rptr. 886, 892); an "indispensable party" (*State ex rel. State Highway Com. v. Quesenberry* (1964), 74 N. M. 30, 32-33, 390 P. 2d 273, 275); and the person who has "an interest in the controversy adverse to the plaintiff" (*State ex rel. Hartoon v. Sweeney* (Ohio App. 1950), 61 Ohio Abs. 561, 105 N.E.2d 660). Under the circumstances of this particular case, the court had the statutory authority (section 25 of CPA) to add the Director as a respondent. Moreover, the power to add such parties as may be affected by the result of either an order in the nature of mandamus or a judgment of injunction is inherent. *People ex rel. Public Service Com. v. New York Telephone Co.* (1940), 21 N.Y.S.2d 405, 409, 174 Misc. 517; *State ex rel. Kubel v. Plummer* (1924), 130 Wash. 135, 139, 226 P. 273, 275.

For all of these reasons we reject the Director's asserted challenge to the court's jurisdiction over him. The entry into the proceedings of both the Conservator and the Director might appear to be unorthodox, however,

such was necessary to the facts of this case. The presence of both parties in this continuing litigation is necessary in order to hopefully assist in solving the many issues raised in this matter.

## II.

On December 8, 1976, the trial court found defendant neither in need of mental treatment, nor mentally retarded. Nevertheless, the court ordered the Department to retain custody of defendant during the bail proceedings. The Director maintains that the court erred in doing so because it had no authority to order the Department to "hold" an unfit, uncommittable defendant. We agree.

■■ A defendant who is found unfit to stand trial is remanded to a hospital for a hearing to determine if he is in need of mental treatment. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a).) The hearing into an unfit defendant's need for mental treatment is conducted in accordance with the terms and procedures of the MHC. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a); *People v. Byrnes* (2d Dist. 1972), 7 Ill. App. 3d 735, 738, 288 N.E.2d 690.) The MHC contains two criteria for a defendant's need of hospitalization: that he is a person in need of mental treatment, or that he is mentally retarded. (Ill. Rev. Stat. 1975, ch. 91½, pars. 1—11, 1—12; *People v. Lang* (1st Dist. 1975), 26 Ill. App. 3d 648, 658, 325 N.E.2d 305, *cert. denied* (1976), 423 U.S. 1070, 47 L. Ed. 2d 80, 96 S. Ct. 851.) If it is determined that the unfit defendant is not in need of hospitalization, then the Department must petition the trial court to release the defendant on bail or recognizance. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a).) Once the petition is filed, the court must hold a hearing into the question of the defendant's release. *People ex rel. Martin v. Strayhorn* (1976), 62 Ill. 2d 296, 342 N.E.2d 5.

■■ The Director argues that once the trial court found that defendant was unfit to stand trial and not in need of hospitalization and the Department petitioned for defendant's release, the court had no legitimate statutory or clinical justification to order the Department to retain custody of defendant in Department facilities. Our recent opinion in *People v. Ealy* (1st Dist. 1977), 49 Ill. App. 3d 922, 365 N.E.2d 149, supports the Director's contention. In *Ealy* the court below set bail for the unfit, uncommittable defendant in an amount which allegedly precluded his release. We held, in part, that the court was not authorized to order the Department to hospitalize the defendant pending his appeal:

> "The Mental Health Code, when read in conjunction with the Unified Code of Corrections, clearly indicates that when a person charged with a felony has been found unfit to stand trial, only if such person is thereafter found to be in need of hospitalization, can he be admitted to a facility of the Department.* * *

\* \* \* there is nothing in either the Unified Code of Corrections or the Mental Health Code permitting unfit defendants to be housed in Department facilities when the Department has already determined that no treatment can be offered to an individual found not in need of mental treatment." (49 Ill. App. 3d 922, 937-38.) It is obvious the trial court was concerned about the defendant's environment and possible continued training. Nevertheless, we can find no authority for the trial court to order the Department to house defendant pending the outcome of lengthy bail proceedings.

Yet the Conservator contends that the trial court was authorized to so order the Department because the retention of custody was ordered to foster release on bail, not to prevent it. Since our supreme court held in *People ex rel. Martin v. Strayhorn* that section 5—2—2(a) of the UCC dictates the release of the unfit, uncommittable defendant on bail or recognizance, we have consistently held that the trial court must conduct a hearing and determine the defendant's release on bail or recognizance. (*E.g., Ealy; People v. Williams* (1st Dist. 1977), 48 Ill. App. 3d 842, 362 N.E.2d 1306; *People v. Theim* (1st Dist. 1977), 52 Ill. App. 3d 160, 367 N.E.2d 367; *People v. Patterson* (1st Dist. 1977), 54 Ill. App. 3d 931, 370 N.E.2d 819.) The Conservator maintains that *Martin* and its progeny are distinguishable because here the trial court did not order the Department to hold defendant in lieu of setting bail. Instead, the court conducted a complex bail hearing, during the course of which defendant remained at ISPI. We think, however, that the court could no more order the Department to retain custody of defendant during the bail hearing than the court in *Ealy* could order the Department to hold the defendant pending his appeal. In both cases the Department was ordered to do what it believed was beyond the court's authority to order. In both cases the Department was ordered to house a defendant whom the Department believed more properly belonged in the Cook County Jail. Although the trial court here was not engaged in any hidden exercise in preventive detention and was understandably attempting to strike a balance of interests as required by *People ex rel. Hemingway v. Elrod* (1975), 60 Ill. 2d 74, 322 N.E.2d 837, it exceeded its authority. The circuit court is not authorized to establish procedures and guidelines for the Department. *Ealy,* at 937.

While we deem the trial court's order error, the reason for the order's entry is important. The court had conducted lengthy hearings into the question of whether defendant was in need of mental treatment or mentally retarded. The State presented three expert witnesses: Dr. A. Arthur Hartman, a registered clinical psychologist and director of the department of psychology of the Psychiatric Institute of the Circuit Court of Cook County, Dr. Robert Reifman, assistant director of that Institute,

and Dr. Joseph Garvin, a registered clinical psychologist. On the basis of psychological tests he attempted to administer on three occasions, Dr. Hartman classified defendant as a mental defective with an estimated age level of about 7, as mentally defective with a permanent severe limitation in communication, and as mentally retarded and functioning at a seven-year level, with additional severe limitation in language and symbolic functions or aphasia. On the basis of three examinations, Dr. Reifman diagnosed defendant as mentally retarded with explosiveness and dangerous to others. Dr. Garvin diagnosed defendant as mentally retarded with an I.Q. of 50 to 60 and mental age of 7, with a degree of emotional disturbance, impulsivity and some agitation. The three State experts agreed that defendant was dangerous to others and likely to be dangerous to himself or others in the future as a result of mental retardation.

In order to refute such testimony, the Public Defender called a series of witnesses. Dr. Edward Page-El, a neurologist and pediatrician at the Illinois Institute of Developmental Disabilities, said that defendant's I.Q. was in the 82-100 range. A major portion of Dr. Page-El's work involved the evaluation and diagnosis of mentally retarded persons and persons with other neurological deficits. His testing of defendant was pursuant to the advice and direction of Dr. Donoghue, another defense expert. Dr. Jewett Goldsmith, a board certified psychiatrist and Clinical Director of the Forensic Psychiatry Program at ISPI, observed defendant daily for about seven months. Although he did not think defendant was either mentally retarded or mentally ill, Dr. Goldsmith felt defendant suffered from a mental disorder but not from any type of psychosis or neurosis. He gave no specific diagnosis because he could not determine if defendant's behavior was maladaptive or adaptive behavior due to his handicap.

Defendant was also examined by Dr. Robert J. Donoghue, a school and registered clinical psychologist with a Ph.D. in the psychology of the deaf. Dr. Donoghue had tested between 2,000 and 3,000 deaf persons. In explaining the problems of evaluating test scores of deaf persons, he emphasized the importance of rapport and testing environment. Although he is deaf, Dr. Donoghue said that while one would not have to be deaf to psychologically test a deaf person, it is debatable whether one with a Ph.D. in clinical psychology but little experience with the deaf could be able to evaluate the results. Dr. Donoghue diagnosed defendant as neither mentally retarded, nor mentally ill, but socially and educationally retarded. He believed defendant to be of at least average intelligence and possibly bright normal. Moreover, Dr. Donoghue testified that given time and training in a sheltered environment, defendant could engage in a normal conversation in three to five years.

John Schneir, a certified social worker employed at ISPI, testified as to

defendant's prior history and behavior at ISPI. Based upon the material he compiled and his own observations, Mr. Schneir though that defendant was not mentally retarded but very self-centered. Joyce Johnson, a registered nurse with a specialty in psychiatric nursing and assistant head nurse of the Forensic Unit at ISPI, testified that defendant was self-sufficient, independent, and cooperative on the ward, but that once he had had to be physically restrained. Susan Matti, a registered occupational therapist employed at ISPI, said that having observed defendant in occupational therapy shop, she though defendant had a high skill level while working on craft projects and exhibited above average skills for the patient population. John La Bon, a recreational therapist at ISPI, discussed defendant's progress in the occupational therapy shop and told of defendant's attempts at sign language.

The final witness was Rhoda Mae Haight, a registered interpreter of the deaf and author of many articles dealing with sign language. She was defendant's teacher and therapist at the Siegel Institute of Communication Disorders of the Michael Reese Hospital.[3] In the course of teaching defendant sign language, she observed him teaching staff members on the unit signs she had taught defendant. After she taught defendant 30 signs, he learned 20 more on his own from a book she had given him. Ms. Haight testified that defendant learned sign language more rapidly than anyone she had ever taught.

The court thereafter entered its order requiring the Department to collaborate with the Public Defendant in developing an appropriate, permanent training program and living arrangement in compliance with the special conditions of bail. The Department was ordered to retain custody of defendant at ISPI so that there would be no disruption of his current training. Although that order exceeded the court's authority, a review of the expert testimony demonstrates why the court entered it. In the words of the court by the Honorable Joseph Schneider:

"Whether Lang will be able to maintain his apparent motivation to learn cannot be predicted with any high degree of accuracy. However, for the first time in the approximately ten years that he has been involved in various aspects of the criminal justice system, the possibility of meaningful training and progress seems to be present. It is important to recognize that this learning took place during confinement. Judicial requirement that a person undergo treatment under coercive conditions may be necessary as stated by a prominent psychiatrist experienced in the legal process:

Most persons whom society involuntarily commits are

---

[3] Ms. Haight was employed by the Siegel Institute as a recognized expert in the field of teaching sign language. The Department made financial arrangements so that she could teach sign language to defendant at ISPI.

consciously or unconsciously so convinced that no one cares, indeed they look at offers of help with such suspicion, that a sustained period of exposure to an unaccustomed world of trust, respect, and care is required in order to attempt to modify these beliefs. It is possible, without precisely knowing when it is and when it is not, to change defiant, ignorant, and fearful attitudes about treatment through patient and persistent efforts in an institutional setting. Behind the conscious refusal of treatment, other unconscious wishes also operate—to be protected, to be cared for, to be sustained, to be helped. What weight should be given to these wishes when they are almost drowned out by words which damn their own self and the world? [J. Katz, 'The Right to Treatment—An Enchanting Legal Fiction?' 36 U. Chi. L. Rev. 755 (1969).]

Such an environment for Lang appears to have been the Illinois State Psychiatric Institute."

■■■ The interplay of the UCC and the MHC makes clear, however, that the Department may not properly be ordered to house unfit defendants who are not in need of hospitalization. Even under the guise of its equitable powers, the trial court could not order the Department to ignore the statutory mandate. It is not in the power of the trial court to relieve against the force of a statute, the meaning of which is not doubtful. (*Donoghue v. City of Chicago* (1870), 57 Ill. 235, 238; *Woman's American Baptist Home Mission Society v. Rayburn* (2d Dist. 1916), 203 Ill. App. 577, 580.) Under the present statutory scheme, the county jail is the only place for an unfit, uncommittable defendant who is awaiting the outcome of his bail hearing. Although the expert testimony in this case showed that defendant required training which the Cook County Jail did not offer, the court was nevertheless bound to transfer defendant from the Department to the jail once it was determined that defendant needed no hospitalization. It is the duty of the trial court to interpret the statute as it is, regardless of the court's own opinion as to the desirability of the results stemming from that interpretation. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 306-07, 134 N.E.2d 249; *People v. McCoy* (1st Dist. 1975), 29 Ill. App. 3d 601, 607, 332 N.E.2d 690, *aff'd* (1976), 63 Ill. 2d 40, 344 N.E.2d 436.) We note, however, that an order of court is needed to transfer a defendant from the custody of the Department to the custody of the sheriff, and that the Department is not empowered on its own to relinquish such custody.[4]

On February 18, 1977, the Department petitioned for defendant's

---

[4] Apparently, on October 3, 1977, the Department transferred the defendant without a court order to the sheriff who accepted him without a court order. At least we can find no such orders in the record.

release from ISPI on bail or recognizance. Thereafter the trial court vacated its order requiring the Department to hold defendant; and the Public Defender applied to the Department for defendant's voluntary admission. Defendant was accepted and his training in sign language continued. When the Department told the court in September of 1977 that it planned to discharge defendant to the sheriff's custody, the Conservator and the Public Defender obtained a temporary restraining order. Once the temporary restraining order was dissolved and defendant was taken to jail, the Public Defender again executed forms for defendant's voluntary or informal admission. The request was denied.

The Conservator now contends that the Department's refusal to accept defendant in a voluntary or informal status was an abuse of discretion. He notes that during the commitment hearing, Dr. Page-El testified that while defendant is not retarded, he has a neurological impairment which fits into the classification of developmental disability. As the doctor's testimony established that defendant's impairment meets the statutory definition of "developmentally disabled," the Conservator maintains the Department abused its discretion by refusing to admit defendant as a voluntary or informal admission. Moreover, the Conservator points out that via a recent amendment to the MHC, adequate and humane care and treatment include the regular, daily use of sign language for hearing-impaired patients who use sign language as a primary mode of communication. (Ill. Rev. Stat. 1977, ch. 91½, par. 12—1.) Lastly, the Conservator emphasizes several of the trial court's statements: that no training program was successful until the Department's program; that defendant needs to make continued progress in sign language; and that all training has now been discontinued at the jail.

■■ The Director contends that the Conservator may not raise the issue of abuse of discretion by the Superintendent of ISPI because the Conservator failed to file a notice of cross-appeal. (Ill. Rev. Stat. 1977, ch. 110A, par. 303(a).) The issue has been waived. On the failure of appellee to take or prosecute a cross-appeal, we are confined to issues raised by the appellant and will not consider errors urged by appellee when they are not related to the issues raised by the appellant. *Clodfelter v. Van Fossan* (1946), 394 Ill. 29, 33, 67 N.E.2d 182; *National Football League Properties Inc. v. Dallas Cap & Emblem Manufacturing, Inc.* (1st Dist. 1975), 26 Ill. App. 3d 820, 821, 317 N.E.2d 247.

■■ Lastly, the Conservator argues that the trial court had the authority to order the Department to retain custody of defendant because the Department failed to satisfy the legal prerequisites for defendant's discharge. Specifically, the Conservator complains that the Department failed to follow the directions in section 100—15 of the MHC (Ill. Rev. Stat. 1977, ch. 91½, par. 100—15), which provide for the applicable

discharge procedures for patients. The Director responds that defendant's transfer to the sheriff did not involve an absolute discharge from treatment because defendant's admission to the Department never occurred pursuant to the MHC. Since defendant was never adjudged in need of hospitalization, he was never admitted to the Department for that purpose. Thus, the discharge provisions of 100—15 were not applicable to defendant's "release" to the sheriff.

### III.

The Director also maintains that the court had no statutory authority to order the Department to collaborate with the Public Defender in developing a training program for defendant. We again agree. Section 5—2—2 of the UCC clearly provides that once a defendant is found unfit, the trial court must remand him to the Department to determine if he requires hospitalization, and then release him on bail or recognizance if he does not require hospitalization. There is no implicit authority to order the Department to develop a training program.

■■ Where the language used in a statute is plain and certain, it must be given effect by the courts and we cannot legislate but must interpret the law as announced by the legislature. (*Smith v. Board of Education* (1950), 405 Ill. 143, 148, 89 N.E.2d 893.) Our only legitimate function is to declare and enforce the law as enacted by the legislature, to interpret the language used by the legislature where it requires interpretation, and not to annex new provisions or substitute different ones, or read into a statute exceptions, limitations, or conditions which depart from its plain meaning. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 307, 134 N.E.2d 249.) It is not within our province to take from or enlarge the meaning of a statute by reading into it language which will, in our opinion, correct any supposed omission or defects. (*American Steel Foundries v. Gordon* (1949), 404 Ill. 174, 180-181, 88 N.E.2d 465.) We have no right to say that the legislature did not mean what in plain language it said and must give effect to the legislative intention regardless of the consequences. (*Beckmire v. Ristokrat Clay Products Co.* (2d Dist. 1976), 36 Ill. App. 3d 411, 415, 343 N.E.2d 530.) Thus, expediency born of changing circumstances and conditions will not alter the meaning of plain and ordinary language used in a statute. *Dean Milk Co. v. City of Chicago* (1944), 385 Ill. 565, 571, 53 N.E.2d 612.

Here the statute plainly provided the trial court with direction. In light of the history of this case and this defendant, we appreciate the court's dilemma, but a court may not inject provisions not found in a statute, however desirable or beneficial they may be. The circuit court may only perform those actions specifically authorized by statute and absent specific authority from the legislature may not act. See *In re Washington*

(1976), 65 Ill. 2d 391, 359 N.E.2d 133; *People v. Breen* (1976), 62 Ill. 2d 323, 342 N.E.2d 31; *Harper College Faculty Senate v. Board of Trustees* (1st Dist. 1977), 51 Ill. App. 3d 443, 366 N.E.2d 999.

## IV.

■■■■ Having determined that the trial court had no authority to order the Department to collaborate in the development of a program, it follows that the court could not properly issue a writ of mandamus against the Director requiring him to direct and implement such a program. A writ of mandamus will not issue to compel a party to perform an act unless it is affirmatively made to appear that it is his clear duty to do so. (*White v. Board of Appeals* (1970), 45 Ill. 2d 378, 381-82, 259 N.E.2d 51; *People ex rel. Adamowski v. Dougherty* (1960), 19 Ill. 2d 393, 400, 167 N.E.2d 181; *La Salle National Bank v. Village of Riverdale* (1959), 16 Ill. 2d 151, 160, 157 N.E.2d 7; *People ex rel. Pignatelli v. Ward* (1949), 404 Ill. 240, 244, 88 N.E.2d 461; *People ex rel. Sanitary District v. Schlaeger* (1945), 391 Ill. 314, 331-32, 63 N.E.2d 382.) Moreover, mandamus is not proper where the right of the petitioner must be established or the duty of the officer sought to be coerced must first be determined. (*Retail Liquor Dealers Protective Association v. Schreiber* (1943), 382 Ill. 454, 460-61, 47 N.E.2d 462; *People ex rel. Rude v. County of LaSalle* (1941), 378 Ill. 578, 580, 39 N.E.2d 25.) Thus, the writ of mandamus confers no new authority upon the person or body against whom it is issued—it creates no duty, but will issue only when the duty and authority to act already exist without the writ. *People ex rel. Brecheisen v. Board of Review* (1936), 363 Ill. 106, 112-13, 1 N.E.2d 402.

■■ Although the Director had no clear duty to direct and implement a training program for defendant, the Conservator contends that the writ properly issued because the Department was subject to the court's discretion in setting conditions of bail. As a condition of bail, the court may require an unfit, uncommittable defendant to submit to or secure treatment for his mental condition. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a).) The Conservator argues that the court exercised its sound discretion by ordering the most obvious supplier of mental treatment in this State to provide it. While the court may require a defendant to secure treatment, it may not order the Department to provide it to an unfit defendant whom the Department has already determined does not need hospitalization. The Department operates within its own guidelines; and the onus is on the unfit, uncommittable defendant to locate a program offering appropriate treatment. For the reasons discussed above, section 100—15 of the MHC, including the after-care provisions, is inapplicable to the case at bar. Neither that section or section 504 of the Federal Rehabilitation Act of 1973 authorized the writ of mandamus. That section

prohibits discrimination on the basis of mental or physical handicap in any program receiving Federal financial assistance. (29 U.S.C. §794 (Supp. 1973).) The Act presumes that the individual in question is lawfully within a State program and that the program receives Federal assistance. (See *Sites v. McKenzie* (N.D. W.Va. 1976), 423 F. Supp. 1190, 1197.) The record before us does not establish either fact.

The Conservator claims that without the writ of mandamus defendant will be deprived of due process, a speedy trial, equal protection and the spirit of *Jackson v. Indiana* (1972), 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845. These constitutional questions are more directly related to defendant's *habeas corpus* action; and we will, therefore, review them separately in that context. In our opinion, the Conservator's true complaint is that the State of Illinois wants defendant to stand trial yet it deprives him of the tools necessary to render him fit to stand trial. However, the Department and its Director have no legal obligation to implement a training program; and we cannot enforce moral obligations. Mandamus against an executive official is a remedy available only to enforce fixed legal duties and not questions of morality, except as they coincide with legal rights and plain duties. *In re Goldberg v. Hoffman* (7th Cir. 1955), 225 F.2d 463, 466.

The present statutory scheme binds the courts. Once again the history of the Donald Lang case manifests the desperate need for substantial change in Illinois law. Until the legislature enacts appropriate legislation to deal with situations such as this, we can only endeavor to follow the mandate of present law. We can do no more.

## V.

Section 5 of the Habeas Corpus Act provides in part that the court shall award a writ of *habeas corpus,* unless it appears from the petition or the documents annexed thereto that the party cannot be discharged, admitted to bail, or otherwise relieved. (Ill. Rev. Stat. 1977, ch. 65, par. 5.) In this case defendant's bail was set at $50,000, which the Conservator could execute. The Public Defender maintains, however, that the act of setting bond was an inadequate remedy and that it did not satisfy the rule of *Jackson v. Indiana.* Moreover, defense counsel argue that our courts recognize the propriety of a *habeas corpus* action where circumstances of a defendant's extended incompetency conflict with his assertion of constitutional rights. *People v. Culhane* (1st Dist. 1975), 34 Ill. App. 3d 158, 160, 340 N.E.2d 63, citing *People ex rel. Myers v. Briggs* (1970), 46 Ill. 2d 281, 263 N.E.2d 109; *People v. Byrnes* (2d Dist. 1972), 7 Ill. App. 3d 735, 288 N.E.2d 690.

By its order dated October 24, 1977, the trial court set defendant's bond as $50,000. It also required that within 30 days from the date of

defendant's release on bail, defendant was to be placed in a training program which had as its purpose the teaching of communication skills in order to make him fit to stand trial. The Public Defender concedes that the conditions on bail are reasonable in light of *People ex rel. Hemingway v. Elrod* (1975), 60 Ill. 2d 74, 322 N.E.2d 837, and *Ealy*. Yet defendant's attorneys urge that the history of their client's encounters with the legal system demonstrate why defendant must apply for release from all vestiges of custody.

In *Myers*, our supreme court permitted defendant's *habeas corpus* action where the superintendent of a State institution wrote to the Department's attorney, detailing defendant's failure to learn communication. The court held that the letter or report of evaluation was a cause for discharge. When a prisoner is in custody by virtue of lawful court process, he may become entitled to his discharge "by some act, omission or event which has subsequently taken place." (Ill. Rev. Stat. 1977, ch. 65, par. 22; see also *People ex rel. Jefferson v. Brantley* (1969), 44 Ill. 2d 31, 34, 253 N.E.2d 378; *People ex rel. Skinner v. Randolph* (1966), 35 Ill. 2d 589, 590, 221 N.E.2d 279; *People ex rel. Castle v. Spivey* (1957), 10 Ill. 2d 586, 593, 141 N.E.2d 321.) The *Myers* court commented that:

> "[T]his defendant, handicapped as he is and facing an indefinite commitment because of the pending indictment against him, should be given an opportunity to obtain a trial to determine whether or not he is guilty as charged or should be released." (46 Ill. 2d 281, 288.)

Although the case was later reinstated, the State was unable to proceed to trial due to the death of the principal witness. Defendant was released. In 1971, defendant was indicted for a second murder; and in 1972, he was tried and convicted. As of January 1, 1973, sections 5—2—1 *et seq.* of the UCC became operative. When we reversed the conviction in *Lang*, the cause was remanded with directions that defendant's fitness to stand trial be determined pursuant to section 5—2—1. We noted that while the trial court tried to follow the *Myers* dictates, it appeared quite clear "that there were no trial procedures which could effectively compensate for the handicaps of a deaf mute with whom there could be no communication." (*People v. Lang* (1975), 26 Ill. App. 3d 648, 653; compare *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836.) At the present time defendant is unfit to stand trial and not in need of hospitalization. The Public Defender contends that under current law defendant may no longer demand trial under the *Myers* rationale and that, therefore, he must apply for his freedom. The crux of this ill-defined claim is the rule from *Jackson v. Indiana*.

The United States Supreme Court held in *Jackson v. Indiana* that:

> "[A] person charged by a State with a criminal offense who is

committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (406 U.S. 715, 738, 32 L. Ed. 2d 435, 451, 92 S. Ct. 1845.)

Although the Public Defender argues that *Jackson v. Indiana* is a literal "commit or release" rule and that section 5—2—2 does not satisfy such rule, we held otherwise in *Ealy.* There we said that *Jackson v. Indiana* does not prohibit the trial court from releasing the unfit, uncommittable defendant subject to the statutory provisions of 5—2—2 and the requirements for bail set forth in sections 110—5(a)[5] and 110—10(a)[6] of the Code of Criminal Procedure. (49 Ill. App. 3d 922, 935.) In the case at bar, therefore, defendant could be properly released on bail or recognizance "under such conditions as the court finds appropriate." Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a).

It is clear from the record that the Public Defender believes *Jackson v. Indiana* has been violated because defendant is making no progress toward becoming fit while he is incarcerated. The trial court said that when it is determined that defendant will be able to stand trial in the foreseeable future, his continued detention may be justified only by continued progress toward the goal of fitness. Yet the Public Defender maintains that there has been no determination that defendant will be fit in the foreseeable future—only Dr. Donoghue's opinion that within three to five years of intensive training defendant might be fit. Like the trial court, we accord great weight to Dr. Donoghue's opinion in light of his special expertise with the deaf. The obvious problem is that defendant

---

[5] Section 110—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 110—5(a)) provides:

"(a) The amount of bail shall be:

(1) Sufficient to assure compliance with the conditions set forth in the bail bond;

(2) Not oppressive;

(3) Commensurate with the nature of the offense charged;

(4) Considerate of the past criminal acts and conduct of the defendant;

(5) Considerate of the financial ability of the accused."

[6] Section 110—10(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 110—10(a)) provides:

"(a) If a person is admitted to bail before conviction the conditions of the bail bond shall be that he will:

(1) Appear to answer the charge in the court having jurisdiction on a day certain and thereafter as ordered by the court until discharged or final order of the court;

(2) Submit himself to the orders and process of the court; and

(3) Not depart this State without leave; and

(4) Not violate any criminal statute of any jurisdiction; and

(5) Such other reasonable conditions as the court may impose."

currently resides in the Cook County Jail where all training has ceased. We think it clear that the Conservator's failure to post bond and defendant's resulting detention may not be urged by the Public Defender as a basis for release.

In its order denying the petition for a writ of habeas corpus, the trial court stated that the Conservator and the Public Defender had informed the court that they had established, or would establish in the near future, a training program for defendant. If the Conservator posted bail and defendant's training program were instituted, then the special conditions placed on bail by the court would have been met. The court concluded, therefore, that a writ of habeas corpus did not lie. However, so far as we can determine, the program was never established. Although there were extended negotiations with the Crossroads Rehabilitation Center of Indianapolis, Indiana, the plan for defendant's training there never came to fruition. The county prosecutor for Marion County, Indiana, objected to defendant's presence in his county while an indictment was pending in Cook County. The State in its brief did not respond to the Public Defender's allegations that the State's Attorney of Cook County informed the Indiana prosecutor of the plan, invited him to the proceedings, and specifically sabotaged the Crossroads plan. At oral argument of the cause the State admitted certain contact with the Indiana prosecutor but denied any attempt to sabotage the plan. In any event the proposed training at Crossroads did not occur and the State never offered any alternative plans for rendering defendant fit to stand trial. The Public Defender contends that the State has done indirectly what it could not do directly; *i.e.*, keep defendant in custody without trying him for murder.

■■ In recognition of the directive of *Jackson v. Indiana*, the voluminous testimony as to defendant's need for communication training and the fact of his continued custody for seven years, we think defendant must be released on bail. The court's order of October 24, 1977, first set bail at $50,000 and noted the applicability of the 10% deposit provision. The bail is in an amount appropriate for the nature of the charge and the ability of the defendant, by the Conservator, to post. We believe the bail is wholly reasonable. Equally reasonable is the second condition that defendant be placed in a training program within 30 days of his release. The order of October 24, 1977, also provided that the order of October 11, 1977, was to remain in full force and effect subject to the two conditions above. We have reversed the prior order issuing a writ of mandamus against the Director. In essence, therefore, defendant must be placed in a training program which has as its purpose the teaching of communication skills in order to make him fit to stand trial, but the Department and its Director may not be ordered to design such a program.

■■ The Conservator and the Public Defender have mistakenly assumed that the Department has the sole obligation to design a training program for defendant. The Department may not be ordered to train defendant since he has been determined not in need of hospitalization. We think the Conservator and the Public Defender, as defendant's true representatives, are the parties charged with the legal obligation of taking such action as is necessary to either locate or design the intensive communication program required. We do recommend, however, that the Department, the Director, and the superintendents of various Department facilities give serious consideration to accepting defendant as an informal or voluntary admission. Having been relieved of the burden of unauthorized court orders, the Department should be more inclined to exercise its discretion in defendant's favor. The defendant is embroiled in our legal system because of the pending indictment; the people of this State have an interest in rendering defendant fit to stand trial so that the criminal trial can proceed. We would hope that the State's Attorney would assist, as fully as possible, in any training program.

To ensure that the trial court is fully apprised of defendant's continuing progress toward the goal of fitness, we also set an additional condition of bail. Every 30 days after defendant's placement in a program, the Conservator and the Public Defender shall submit to the circuit court a detailed written report on defendant's progress. We suggest that the Department and the State may also wish to contribute their efforts toward a training program; and any such efforts or suggestions should be directed to the Conservator and the Public Defender. Nevertheless, the primary responsibility for defendant's training remains with the Conservator and the Public Defender who are hereby ordered to submit monthly joint reports on defendant's progress to the circuit court.

## VI.

Lastly, the Public Defender maintains that the court erred by failing to dismiss the indictment pending against defendant. In *People v. Lawson* (1977), 67 Ill. 2d 449, 455, 367 N.E.2d 1244, the Illinois Supreme Court held that the trial court has the inherent authority to dismiss an indictment where there has been a clear denial of due process even though that ground is not stated in the statutory list of grounds for dismissal of charges. (Ill. Rev. Stat. 1975, ch. 38, par. 114—1.) Defense counsel contend that the denial of training to defendant which might render him fit in three to five years is such a denial of due process. According to the Public Defender, the clear denial of due process here, when *Lawson* is interpreted with *Jackson v. Indiana*, requires that the pending indictment be dismissed.

We recently said in *People v. Williams* (1st Dist. 1977), 48 Ill. App. 3d 842, 850, 362 N.E.2d 1306, that *Jackson v. Indiana* cannot be interpreted to require a State to either try unfit defendants or dismiss the pending charges against them. *Williams* also made clear that the prescription of bail or recognizance under 5—2—2(a) implies the pendency of the indictment or else there would be no need for bail or recognizance bond to secure the defendant's return. (48 Ill. App. 3d 842, 848.) Furthermore, the court in *Lawson* cautioned that its holding must not be construed as an invitation to disregard statutory provisions on dismissal. (67 Ill. 2d 449, 457.) In view of the special conditions now set on bail, we think it is premature to dismiss the indictment. Until the Conservator posts bail and defendant is placed in a training program, there can be no accurate gauge of defendant's progress. The Public Defender's claim that the indictment should be dismissed is premised on the belief that the denial of training constitutes a denial of due process. If the special conditions now placed on bail are met, however, the due process claim is vitiated.

Nor can we agree that defendant has already lost his constitutional right to a speedy trial. In *Barker v. Wingo* (1972), 407 U.S. 514, 530, 33 L. Ed. 2d 101, 92 S. Ct. 2182, the United States Supreme Court adopted a four-part balancing test to determine when the right to a speedy trial has been violated. The factors to be considered are: (1) length of delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. Here the reason for the delay is of utmost importance: defendant's unfitness to stand trial. As we indicated in *Williams,* the legislature has determined that the right to a speedy trial is held in abeyance during the continuance of a defendant's condition of unfitness. (48 Ill. App. 3d 842, 849.) Until the legislature alters the present statutory scheme inherent in section 5—2—2 *et seq.* and section 103—5 of the Code of Criminal Procedure, defendant's right to a speedy trial may be diluted. Instead, the issue would have to be raised in the context of *Jackson v. Indiana,* as was done here. In our opinion, *Jackson v. Indiana* has not yet been violated, but that the outcome of defendant's training is the key. We think that if defendant can be rendered fit to stand trial in three to five years, as Dr. Donoghue testified, then defendant should be allowed that chance. On the other hand, we also think that the cause should be monitored continuously in order that defendant's constitutional rights are not forgotten.

## VII.

The case of Donald Lang cries out for legislative attention. As a result of two separate murder charges, defendant has spent 11 of the past 12 years in custody. He has been in custody since 1971 under the current

indictment. Despite the changes brought about by the enactment of the UCC, the State of Illinois still cannot effectively dispose of the multitude of legal problems presented by unfit, uncommittable defendants. We have said in this opinion that the circuit court erred by going beyond the direction of the statute. At the same time, however, we appreciate that the trial court undertook that course of action because the legislature has failed to afford guidance.

In Illinois the Department may treat unfit defendants only where they require hospitalization. In *Ealy*, we demonstrated that "a person charged with a felony may be found unfit to stand trial, but not sufficiently in need of mental treatment under current standards to be committed." (49 Ill. App. 3d 922, 929.) We said that the *Ealy* case cried out for prompt and clear legislative action. None has been forthcoming. We no longer have a James Ealy before us; now we encounter Donald Lang, the illiterate deaf-mute who possesses the notorious ability to stymie the Illinois legal system. The people of the State of Illinois expect the courts to follow and interpret the law, but not to create it. Judicial activism is the result of legislative inaction.

The Director has brought to our attention that other States authorize their departments of mental health to treat an unfit defendant for the conditions which underlie or are the cause of his unfitness for trial. In Michigan the court is authorized to order treatment of an unfit defendant in a department facility. (Mich. Comp. Laws Ann. §330.2032 (1975).) In Wisconsin the court is authorized to commit an unfit defendant to the department's custody. (Wis. Stat. Ann. §971.14 (1971).) In California the court is authorized to order the sheriff to deliver an unfit defendant to a State hospital. (Cal. Penal Code Ann. §1370 (West).) Yet in Illinois the court is only authorized to remand an unfit defendant for a hearing as to his need for mental treatment. In our opinion the statutory guidelines for hospitalization should authorize treatment for the conditions which underlie or cause a defendant's unfitness to stand trial. We urge the legislature to remedy this situation.

## VIII.

For the sake of clarification, we will summarize our holdings. In appeal No. 77-1541, that portion of the order entered by the court on October 3, 1977, which required the Department to file a petition detailing a program, is vacated. The writ of mandamus entered against the Director on that day and reduced to writing on October 11, 1977, is also vacated. The order denying the Director's motion to vacate, alter or amend that order is reversed. In appeal No. 78-250, the order entered on November 29, 1977, is affirmed insofar as it denied the petition for a writ of *habeas corpus.* Pursuant to the original jurisdiction granted us by article VI,

section 6 of the 1970 Illinois Constitution, we also reset the special conditions on defendant's bail. Those conditions are as follows:

(1) Bail is set at $50,000, which the Conservator may execute on defendant's behalf. The provision allowing for the deposit of 10% of the bail set is applicable.

(2) Within 30 days of defendant's release on bail, the Conservator and the Public Defender shall place him in a training program which has as its purpose the teaching of communication skills in order to render defendant fit to stand trial.

(3) Every 30 days thereafter the Conservator and the Public Defender shall submit to the circuit court a joint written report on defendant's progress toward the goal of attaining fitness.

Affirmed in part; reversed in part; vacated in part; and order entered.

STAMOS, P. J., and BROWN, J., concur.