THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD LANG, Defendant-Appellant.

First District (2nd Division)   Nos. 1—87—1833, 1—87—1872 cons.

Opinion filed January 21, 1992.—Rehearing denied March 12, 1992.

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McCORMICK delivered the opinion of the court:

In 1971, defendant, Donald Lang, was arrested and charged with the murder of Earlene Brown. At the time of the murder, defendant, who has been deaf from birth, was unable to speak, read, or write and did not know sign language. In 1972, defendant was tried for the murder and convicted by a jury. On appeal, after determining that defendant's disabilities deprived him of a fair trial, this court reversed defendant's conviction and remanded the cause for a fitness hearing. *People v. Lang* (1975), 26 Ill. App. 3d 648, 325 N.E.2d 305.

On remand in 1976, defendant was found unfit to stand trial and was placed in the Department of Mental Health's Psychiatric Institute (Department). Subsequently, the trial court allowed the De-

partment to discharge defendant to the Cook County jail. In addition, the trial court issued a writ of *mandamus* requiring the Department to implement a care and treatment program for defendant and denied a writ of *habeas corpus* filed by defendant. In an appeal from the trial court's order, this court vacated the *mandamus* and affirmed the denial of defendant's writ of *habeas corpus. People v. Lang* (1978), 62 Ill. App. 3d 688, 378 N.E.2d 1106.

Following an appeal to the Illinois Supreme Court, the cause was again remanded for a determination of whether defendant remained unfit to stand trial. (*People v. Lang* (1979), 76 Ill. 2d 311, 391 N.E.2d 350.) On remand, the trial court again found defendant unfit and further found that there was no substantial probability that defendant would attain fitness within one year. Subsequently, a commitment hearing was held and the trial court determined that defendant met the criteria for involuntary commitment by the Department of Mental Health. Since that determination, the trial court has held regular hearings on defendant's status. In each, the court has found that defendant continues to meet the criteria for involuntary commitment.

In an appeal from those hearings and from the trial court's denial of defendant's request for a formal hearing on his fitness to stand trial, this court held that defendant was entitled to a formal fitness hearing. However, the court also held that defendant was not entitled to a discharge hearing as set forth in sections 104—23(a) and 104—25 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 104—23(a), 104—25), because defendant's 1972 trial provided him with the one discharge hearing to which he was entitled. *People v. Lang* (1984), 127 Ill. App. 3d 313, 468 N.E.2d 1303.

On appeal, the Illinois Supreme Court reversed that portion of this court's decision denying defendant a discharge hearing. The supreme court held that if, on remand, defendant was again found to be unfit to stand trial, he should be provided with another discharge hearing. *People v. Lang* (1986), 113 Ill. 2d 407, 498 N.E.2d 1105.

On March 23, 1987, another fitness hearing was conducted by the trial court. Following the hearing, defendant was once again found unfit to stand trial, and the court granted defendant's request for a discharge hearing.

At the hearing, Rufus Knight was called as a witness on behalf of the State. Knight testified that in 1971, he lived at the Viceroy Hotel located at 1519 Warren Boulevard in Chicago. Knight stated

that the Viceroy was both a transient and residential hotel, with the top four floors of the building reserved for permanent residents.

Knight testified that on July 25, 1971, at approximately 1:30 a.m., he was in the lobby of the hotel when defendant entered with Earlene Brown. Brown was given a room card by Mattie Ligun, the hotel manager. Brown filled out the card and gave it to defendant, who then paid Ligun. After receiving the key to room 201 from Ligun, defendant and Brown entered the elevator.

The next time Knight saw defendant was at 3:30 a.m., when defendant returned to the lobby. Knight testified that defendant was alone and that after returning the room key to Ligun, defendant left the hotel. Knight further testified that he did not see Earlene Brown leave the hotel.

James Padar of the Chicago police department testified that on July 26, 1971, he was assigned to Area 4 as a homicide detective. At approximately 12:20 p.m. on that date, he received a call concerning a body found at the Viceroy Hotel. Padar went to the hotel, where he found a woman's body in the closet of room 201. Padar testified that the body, identified as that of Earlene Brown, was lying facedown with the face and upper torso on the floor and the legs extending up along the wall of the closet. Underneath the body were Brown's clothing, two bed sheets and some pillows.

Later that day, Padar arrested defendant and took him to Area 4. Padar testified that after he and defendant arrived at the police station, he noticed that defendant had a reddish-brown stain on one of his socks. These socks and defendant's other clothing were submitted to the crime laboratory for examination.

Timothy Zamb testified that in 1971 he was employed by the Chicago police department as a microanalyst. Zamb testified that in July 1971, he examined blood and bone tissues from Earlene Brown and determined that her blood was type B. Zamb testified that he also tested defendant's clothing and found type B human blood on defendant's T-shirt, socks and pants. Human blood also was found on defendant's shoes, but in an amount insufficient for typing.

Zamb further testified that flakes of green paint were found on the clothing of both defendant and Brown. Zamb testified that he compared the paint flakes taken from defendant's clothing with those taken from Brown's clothing and found that the flakes were similar in color, texture and sheen.

Zamb also testified that he examined a sample of defendant's blood and found it to be type O. And on cross-examination, Zamb

testified that the blood found on defendant's clothing could have been present there for a period ranging from several hours to months.

Also admitted into evidence by the State were transcripts from defendant's 1972 trial and 1976 civil commitment hearing, including the testimony of Mattie Ligun and Sarah Williams, a maid at the Viceroy Hotel. Both Ligun and Williams were deceased at the time of the discharge hearing. A supplemental record containing Williams' testimony has been filed with this court. The transcripts of Ligun's testimony and the testimony of the other witnesses at the 1972 and 1976 proceedings were not made a part of the record on appeal.

At the time of the 1972 trial, Williams was 75 years old. She testified that between 2:30 and 3 a.m. on the morning of July 25, 1971, she went to room 201 and that when she entered the room she noticed that the linen and pillows were missing from the bed. Williams also testified that she found a wet "pinkish" hand towel on the bathroom floor, that there was a small red spot on the wall near the bed and that there was a small "pinkish" spot on the floor by the dresser.

Williams further testified that prior to entering room 201, she was working in the room directly across the hall and that during that time she did not hear any loud or unusual noises coming from room 201, but she did hear voices. Williams also testified that when she was in room 201, she attempted to check the closet but could not open the door.

In 1976, because Williams was 80 years old and in poor health, her testimony was taken in the form of an evidence deposition. At the start of the deposition, Williams was unable to state the date, year or the name of the governor. When questioned about the events of July 25, 1971, Williams stated that on that date she was in room 202 when she received a telephone call from the hotel manager telling her to clean room 201. Williams told the manager that she thought room 201 was still occupied because she had heard voices coming from there. The manager told Williams that the man had left the room, and Williams testified that when she entered the room it was empty, although she had not seen anyone leave.

Williams again testified that the bed in room 201 had no sheets or pillows, that she found a hand towel on the bathroom floor, that there was a spot on the floor and that she was unable to open the closet door.

Defendant's only witness was Robert Hollis, an attorney with the Cook County public defender's office. Hollis testified that in 1976 he worked as an investigator for the public defender's office and that at that time he took part in an investigation of defendant's case.

Hollis testified that as part of the investigation, he visited the Viceroy Hotel in 1976 and discovered that it was possible to step out of the window of room 201 onto the roof of an adjacent structure and then lower oneself to the ground by stepping onto a guardrail or garbage can. Hollis also testified that it was possible to enter room 201 by this method.

At the close of the evidence, the court denied defendant's request for discharge. This appeal followed.

■ Under section 104—23(a) of the Criminal Code, when a defendant is unfit to stand trial and there is not a substantial probability that he will attain fitness within one year from the original finding of unfitness, the defendant may move for a discharge hearing pursuant to section 104—25 of the Code. At the discharge hearing, the trial court must determine whether the evidence is sufficient to establish that the defendant is guilty of the crime charged. (*People v. McBrien* (1986), 144 Ill. App. 3d 489, 494 N.E.2d 732.) As in the case of criminal convictions, the State is required to establish the defendant's guilt beyond a reasonable doubt, although the trial court's determination that the State has met its burden of proof does not constitute a technical determination of guilt. *People v. Rink* (1983), 97 Ill. 2d 533, 455 N.E.2d 64; *People v. Burt* (1986), 142 Ill. App. 3d 833, 492 N.E.2d 233; *People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 467 N.E.2d 1098.

In his appeal, defendant claims that the evidence presented at his discharge hearing was not sufficient to establish his guilt beyond a reasonable doubt. Defendant argues that, therefore, the trial court's decision should be reversed and a judgment of acquittal entered.

According to defendant, Sarah Williams testified in her evidence deposition that she heard the voices of a man and a woman coming from room 201 during her telephone conversation with Ligun. Defendant contends that this testimony establishes that he was not the last person to see Brown alive since Ligun did not call Williams until after she saw defendant leave the hotel. The transcripts of Williams' testimony do not seem to support defendant's contentions.

In her deposition, Williams gave the following testimony:

"Q. When Mrs. Legon [*sic*] called you and told you room 201 was out, did you tell her it was still occupied?

A. I say, 'somebody is in this room.' She said, 'no, the man came out.' I said, 'Okay then.'

Q. What made you think someone was still in that room?

A. I heard that low tone. I heard that low tone of talking in there.

Q. Was this after Mrs. Legon [*sic*] called you?

A. What?

Q. Was this after Mrs. Legon [*sic*] called you?

A. I had heard that when she called me.

\* \* \*

Q. You said you heard talking. Was that talking before Mrs. Legon [*sic*] called you?

A. I heard them talking in the room.

Q. That was sometime before?

A. Before he left out, I guess."

Nothing in Williams' testimony supports defendant's claim that she heard voices from room 201 while she was on the telephone with Ligun. Rather, Williams appears to state that she had already heard talking when Ligun telephoned.

■ In entering its findings, the trial court noted that, according to the transcripts of her testimony, Ligun testified that she called Williams after seeing defendant in the lobby. Williams in turn testified that she entered room 201 after the telephone call from Ligun and found it to be empty. She also testified that she did not see anyone go into or come out of the room.

We find that there was sufficient evidence that defendant was the last person to see Brown alive and that this evidence, coupled with the presence of type B blood on defendant's clothing, was sufficient to meet the State's burden of proving beyond a reasonable doubt that defendant murdered Brown.

■ Defendant also argues that he was denied a fair trial because the trial court either misapprehended the evidence or considered evidence outside of the record in determining defendant's guilt. Defendant's argument is based on comments made by the trial court while entering its findings.

While summarizing the evidence, the trial court noted that "paint chips from the [scene] or paint flakes were of a similar composition to those traced to the Defendant." Defendant argues that because there was no evidence indicating the presence of green paint at the scene of the crime, the court's decision was based on

236

an inaccurate perception of the record and should be reversed. This argument is without merit.

As stated above, Timothy Zamb testified that flakes of green paint were found on the clothing of both defendant and Brown. Zamb further testified that the flakes found on defendant's clothing and those found on Brown's clothing were of a similar color, texture and sheen. Thus, there is nothing inaccurate in the trial court's statement that paint flakes from the scene were similar to those traced to defendant. Moreover, as the State points out, there was no question that defendant and Brown were together at the Viceroy Hotel on the night in question and, therefore, the fact that similar paint flakes were found on their clothing is of limited importance.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.