THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE LAVOLD, Defendant-Appellant.

First District (5th Division)    No. 1—91—0775

Opinion filed May 20, 1994.

GORDON, J., specially concurring.

Appeal from the Circuit Court of Cook County; the Hon. John E. Morrissey, Judge, presiding.

Rita A. Fry, Public Defender, of Chicago (Lynne Hubanks Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Michael R. Slovis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a civil discharge hearing pursuant to section 104—25 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—25 (West 1992)), Lawrence Lavold (Lavold), an unfit defendant, was found not not guilty of the charges of first degree murder and arson, and was remanded to the custody of the Department of Mental Health and Developmental Disabilities (Department of Mental Health) for extended treatment. After the expiration of the extended treatment period, a hearing was held and the trial court determined that Lavold remained unfit for trial. The court also determined that Lavold constituted a danger to himself and others and was subject to involuntary commitment for a period equal to the maximum sentence for first degree murder. On appeal, Lavold argues that (1) the trial court lost jurisdiction after the expiration of the extended treatment period and, therefore, its order subjecting him to involuntary commitment is void; (2) he was denied due process and effective assistance of counsel at the discharge hearing; (3) he was denied effective assistance of counsel at the *habeas corpus* hearing; and (4) the trial court erroneously determined that Lavold was subject to the criminal court's jurisdiction until the year 2035.

## BACKGROUND

In November 1975, Lavold was charged with first degree murder and arson. Subsequently, he posted bail and was released. On December 23, 1975, Lavold failed to appear in court and a warrant

was issued for his arrest. The case was stricken from the call with leave to reinstate.

On June 22, 1981, the case was reinstated and Lavold moved for a psychiatric examination to determine fitness. On August 11, 1981, a psychiatric report was filed with the trial court and a fitness hearing was held. The psychiatric report indicated that Lavold was not mentally fit for trial; the report stated that Lavold was "unable to understand the nature of the charges pending against him and unable to cooperate with counsel in his own defense, because he [was] actively psychotic." Based upon the psychiatric report and stipulated testimony, the trial court determined that Lavold was not fit for trial. Lavold was remanded to the custody of the Department of Mental Health and Developmental Disabilities. The case was stricken from the call with leave to reinstate.

Periodic examinations were conducted on Lavold to determine whether he would attain fitness within one year. Each of the reports filed with the court indicated that Lavold was not mentally fit for trial. On May 17, 1982, a letter was sent to the trial court by the superintendent of the Mental Health Center at Chester. In his opinion, there was not a substantial probability that Lavold would attain fitness within a period of one year from the date of the original finding of unfitness. The report also stated that, pursuant to statute, it was the understanding of the Department of Mental Health that Lavold should be brought to court for a hearing. There is no evidence that this letter was filed with the court or entered as part of the record prior to July 19, 1983, when it was included in a motion filed by Lavold.

On January 26, 1983, Lavold's counsel withdrew from the case and new counsel was appointed on June 2, 1983. It is unclear from the record who was representing Lavold during the interim, but the only action taken was the ordering and filing of fitness examinations. On July 19, 1983, counsel for Lavold filed a motion for a discharge hearing pursuant to section 104—23(a) of the Code of Criminal Procedure (725 ILCS 5/104—23(a) (West 1992)).

On September 6, 1983, Lavold filed a letter with the court stating that he had fired defense counsel because counsel was deceptive, "maleficent" of duty and conducted himself in an illegal fashion. On September 20, 1983, Lavold requested new counsel and a change of venue.

A fitness hearing was commenced in August 1983 and concluded on October 13, 1983. The court concluded that Lavold was not fit for trial and would not be fit for trial within one year.

On November 10, 1983, a discharge hearing was commenced and

after a series of continuances was concluded on May 17, 1984. The State's evidence at the discharge hearing consisted of one witness and stipulated testimony. Lavold did not present any witnesses. Throughout the hearing, Lavold was disruptive and refused the assistance of counsel. The trial court acknowledged Lavold's desire to fire his attorney but appointed counsel over Lavold's objection because the court did not believe that Lavold had the capacity to make such a decision. Lavold's conduct became so disruptive that the trial court ordered the sheriff to remove him from the courtroom. Lavold was able to hear the proceedings over a speaker in the lock-up area.

At the conclusion of the hearing, Lavold was found not not guilty and discharge was denied. Lavold was remanded back to the Department of Mental Health for an extended five-year period of treatment pursuant to section 104—25(d) of the Code of Criminal Procedure (725 ILCS 5/104—25(d) (West 1992)). A certificate was filed, at the time of the discharge hearing, which stated that Lavold was "extremely dangerous" and "a person who [was] mentally ill and because of his illness [was] reasonably expected to inflict serious physical harm upon himself or another in the near future." The case was stricken from the call with leave to reinstate.

On December 2, 1986, defense counsel filed a petition for attorney fees and expenses incurred from June 21, 1983, through August 8, 1986. The trial court granted the petition and ordered the treasurer of Cook County to pay defense counsel $2,777.48 for services rendered.

On August 11, 1989, Lavold filed a *pro se* Federal *habeas corpus* petition pursuant to 28 U.S.C. section 2254 (1988). The petition was denied on March 15, 1990. The district court found that Lavold's initial five-year period of commitment had expired without the State making any attempt to hold an extension hearing as required by law. Therefore, the district court concluded that Lavold was being held in violation of State law and should seek his release in a State *habeas corpus* proceeding.

On September 21, 1989, counsel for Lavold filed a motion for a hearing following treatment pursuant section 104—25(g) of the Code of Criminal Procedure (725 ILCS 5/104—25(g) (West 1992)). The trial court reinstated the case and placed it on call for December 13, 1989. On June 7, 1990, a hearing was held to determine if Lavold was fit for trial or subject to involuntary commitment pursuant to section 104—25(g)(2). Both stipulated and live testimony were heard by the trial court. However, the record of this hearing was not included in the record on appeal. Due to a series of continuances, judgment was not rendered by the trial court until December 13, 1990.

In the interim, Lavold filed a State *habeas corpus* petition. On

December 13, 1990, prior to the trial court issuing judgment on the motion for hearing following treatment, argument was presented on the State *habeas corpus* petition. Throughout the hearing Lavold was represented by a public defender. Again, Lavold continually fired defense counsel. Because of his disruptions, Lavold was removed from the courtroom, but allowed to listen to the proceedings through a speaker system.

On his behalf, defense counsel argued that the jurisdiction of the criminal courts expired on May 17, 1989, and any action taken by the court subsequent to that date, including the hearing on June 7, 1990, to determine involuntary admission, was null and void. The trial court denied the State *habeas corpus* petition, finding that the lack of action from the spring of 1989 until December of 1989 was not sufficient to warrant a remedy of *habeas corpus*. Furthermore, the trial court noted that the State had made adequate attempts to hold the extension hearing.

The trial court also found that Lavold remained unfit for trial, in need of hospitalization, and a serious threat to public safety. Therefore, pursuant to section 104—25(g)(2), the trial court committed Lavold to the Department of Mental Health for a period not to exceed 60 years, the length of the maximum sentence for first degree murder. The trial court retained jurisdiction to approve any conditional release or discharge of Lavold until December 2035. This appeal followed.

OPINION

I

Initially, Lavold contends that the trial court lost jurisdiction after the expiration of the extended treatment period on August 11, 1987, and, therefore, its order subjecting him to involuntary commitment is void. Lavold also argues that he was entitled to be released as of August 11, 1987, and, therefore, the court erred in denying his petition for *habeas corpus*.

■ According to section 104—25(d) of the Code of Criminal Procedure, an unfit defendant may be remanded to the Department of Mental Health for an initial treatment period of one year, as set forth in section 104—23, and this treatment may be extended for a maximum period of five years for the charge of murder. (See 725 ILCS 5/104—25(d), 104—23 (West 1992).) At the conclusion of that six-year period, section 104—25(g) requires the court to determine whether the defendant is still unfit for trial. (See 725 ILCS 5/104—25(g) (West 1992).) If he remains unfit, the court must next determine

whether the defendant is subject to involuntary commitment under the Code of Criminal Procedure. (See 725 ILCS 5/104—25(g)(2) (West 1992).) If so, defendant will be committed to the Department of Mental Health and the trial court will retain jurisdiction solely to approve any conditional release or discharge for a period not to exceed the maximum sentence to which the defendant would have been subject if he or she had been convicted in a criminal proceeding. See 725 ILCS 5/104—25(g)(2) (West 1992).

The date of the trial court's supervisory jurisdiction over the defendant begins to run from the date of the original finding of defendant's unfitness. (*People v. Rasgaitis* (1991), 222 Ill. App. 3d 855.) The extended period for treatment would then begin or relate back to one year from the original finding of unfitness. *People v. Burton* (1988), 166 Ill. App. 3d 143.

In this case, the maximum treatment period permitted before the court was required to hold a section 104—25(g) hearing was six years. Lavold was initially found unfit on August 11, 1981, and was remanded for treatment for one year to attain fitness for trial. When Lavold did not attain fitness within one year, his treatment was extended for five years. The trial court erroneously began the five-year extended treatment period on May 17, 1984, at the conclusion of the discharge hearing. That five-year period ended May 17, 1989. On December 13, 1989, the case was put back on the trial call, and on June 7, 1990, a section 104—25(g) hearing was commenced.

Following *Rasgaitis* and *Burton*, the trial court should have related back the start date of the five-year extended treatment period to August 11, 1982, one year from the finding of unfitness. Thus, Lavold's extended treatment period should have concluded on August 11, 1987, and not on May 17, 1989. Both parties agree that the trial court exceeded Lavold's maximum treatment period without a hearing following treatment by a little over two years before the court placed the case back on the call. The issue before this court is whether that two-year delay deprived the trial court of jurisdiction. We conclude that it did not.

Section 104—25(g) of the Code of Criminal Procedure provides in pertinent part:

"(g) At the expiration of an extended period of treatment ordered pursuant to this Section:
\*\*\*

(2) If the defendant continues to be unfit to stand trial, the court shall determine whether he or she is subject to involuntary admission under the Mental Health and Developmental Disabilities Code or constitutes a serious threat to the public safety. If so

found, the defendant shall be remanded to the Department of Mental Health and Developmental Disabilities \*\*\* for further treatment and shall be treated in the same manner as a civilly committed patient for all purposes, except that the original court having jurisdiction over the defendant shall be required to approve any conditional release or discharge of the defendant, for the period of commitment equal to the maximum sentence to which the defendant would have been subject had he or she been convicted in a criminal proceeding. \*\*\*

(3) If the defendant is not committed pursuant to this Section, he or she shall be released." 725 ILCS 5/104—25(g)(2) (West 1992).

Lavold argues that since he did not receive a section 104—25(g) hearing simultaneously with the expiration of his extended period of treatment, the court lost jurisdiction and he should have been released pursuant to section 104—25(g)(3). We disagree. We do not read this statute to authorize the automatic release of unfit defendants as soon as their treatment period has expired. Rather, the statute requires that an appropriate hearing be held to determine whether a defendant remains unfit, and if so, whether he is subject to involuntary commitment. We do not believe that the legislature contemplated that where there is a delay in providing the appropriate hearing, no hearing will be held and the defendant will simply be released.

■ Certainly, we do not condone the two-year delay that resulted in this case. Indeed, the supreme court has recently condemned the long delays often suffered by criminal defendants confined to mental health facilities. (See *Radazewski v. Cawley* (1994), 159 Ill. 2d 372.) In *Radazewski*, the court held that the time provision contained in section 5—2—4(e) of the Unified Code of Corrections (730 ILCS 5/5—2—4(e) (West 1992)), which governs discharge and conditional release hearings for persons found not guilty by reason of insanity, was mandatory. In that case, the court denied the petitioners' writs of *mandamus* because they had each received or were scheduled to receive hearings pursuant to section 5—2—4(e). Although the supreme court criticized the excessive delays experienced by the petitioners, it did not suggest that the failure to hold a timely hearing deprived the court of its jurisdiction over the petitioners or required their release.

Similarly, in this case, Lavold was given a hearing in accordance with section 104—25(g)(2). Section 104—25(g)(2) provides that if a defendant remains unfit to stand trial, the court shall determine whether he or she is subject to involuntary admission under the Mental Health and Developmental Disabilities Code or constitutes a

serious threat to the public safety. If so found, the defendant shall be remanded to the Department of Mental Health and Developmental Disabilities for further treatment and shall thenceforth be treated as a civilly committed patient. Here, the trial court found that Lavold remained unfit for trial, constituted a serious threat to public safety and was subject to involuntary commitment. We note that such a finding would also have been sufficient to satisfy the requirements of civil commitment pursuant to the Mental Health and Developmental Disabilities Code (405 ILCS 5/1—100 *et seq.* (West 1992)). (See *People v. Polachek* (1984), 128 Ill. App. 3d 200, 205 ("standards for commitment pursuant to section 104—25(g)(2) are exactly the same as the Mental Health and Developmental Disabilities Code's standards for commitment"); see also *People v. Bocik* (1991), 211 Ill. App. 3d 801, 806.) In conclusion, we find that Lavold's hearing, although untimely, was valid and he was not entitled to be released.

## II

Lavold next contends that his due process rights were violated because the discharge hearing, upon which all subsequent court actions were based, was a "complete sham."

■ The State contends that this issue is waived because Lavold failed to appeal from the discharge hearing within 30 days. Although we agree that the issue could be considered waived, given the circumstances of this case we find it appropriate to address Lavold's allegations, and we conclude that they are without merit.

First, Lavold challenges the sufficiency of the evidence. At a discharge hearing, the court must determine whether the evidence is sufficient to establish that the defendant is guilty of the crime charged. (*People v. Lang* (1992), 225 Ill. App. 3d 229, 234.) As in the case of criminal convictions, the State is required to establish the defendant's guilt beyond a reasonable doubt, although the trial court's determination that the State has met its burden of proof does not constitute a technical determination of guilt. *Lang*, 225 Ill. App. 3d at 234.

Lavold was accused of murdering Donald Wedlow (Wedlow) and setting fire to his residence. At the discharge hearing, the State presented the testimony of William McDonald (McDonald). McDonald testified that on October 16, 1975, he was living at 950 Hicks Road in Rolling Meadows, Illinois, with Wedlow and Dale Endre (Endre). He stated that he and his roommates were at home talking around 10, 10:30 p.m. that evening. He testified that he went to bed between 10:30 and 11 p.m., but he remained awake because he was unable to sleep. McDonald explained that the bedroom was off the living room

with only a wall between the two rooms. He stated that around 11 p.m. he heard Endre say goodnight and go upstairs to bed. Later, around 1 a.m., Wedlow came into the bedroom and began talking with him. Suddenly, they heard a loud bang on the front door, and a few seconds later, McDonald observed Lavold peering in the bedroom window. McDonald explained that the bedroom window was only a few feet from the front door and that Lavold could see in the window by leaning over the front porch. McDonald also explained that he knew Lavold because he used to work for him, but he had since left his employ due to a misunderstanding. After Lavold peered in the window, Wedlow went to answer the front door. McDonald heard someone enter the front door and then he heard Lavold's and Wedlow's voices. Lavold told Wedlow that he was looking for a drinking companion. Wedlow came back into the bedroom to get a shirt and then left again. McDonald heard the front door open and close.

Approximately 10 to 15 minutes later, McDonald heard the front door open and close again, and he heard the voices of Lavold and Wedlow. The bedroom door was slightly ajar at this time. McDonald heard Lavold ask Wedlow if they could go downstairs to look at the oil tanks which Wedlow had previously agreed to give to Lavold. McDonald then heard two sets of footsteps walk across the living room floor. He heard the basement door open and the footsteps proceed down the stairs. He heard the voices of Lavold and Wedlow as they descended the stairs but he was unable to understand what was said. He explained that the basement door was approximately five or six feet from his bedroom door. After McDonald heard the footsteps reach the bottom of the stairs, he heard voices coming from the other end of the basement where the oil tanks were located. He explained that the basement had two rooms: one contained boilers and the other was a root cellar; the root cellar was directly beneath his room. He testified that he heard the root cellar door open. He heard faint voices and then all of a sudden it sounded like the voices were almost directly beneath him. He testified that he heard a grunt, which he described as a very hoarse voice and which he identified as Wedlow's voice. He heard the cellar door close again and noise which sounded like metal hitting metal. He also heard a crackling sound, like wood burning in a fire. Next, he heard one set of footsteps running up the stairs. After he heard the footsteps reach the top of the stairs and run across the living room floor, he heard the front door open. He was still in bed at this point and he jumped up and looked out the window to see who was running out of the house. He saw that the man who ran out the door was Lavold; he ran out the front door toward the garage where McDonald lost sight of him. McDonald noticed

that his bedroom was filling with smoke; it seemed to be coming from the basement through the vent. There was a loud explosion in the basement which shook the whole house. He testified that despite the explosion and the smoke coming from the vent, he did not leave the house because he was afraid of Lavold.

Sometime later, he heard someone banging on his window and saw someone shining a flashlight in the window. It was Endre, his other roommate, and he was yelling at him to get out of the house because it was on fire. Once he got out of the house, he and Endre went around the house and kicked in the windows to see how bad the fire was. Then they drove a mile to a phone booth and reported the fire to the police and the fire department. After reporting the fire, they returned to the house to wait for the fire department. On cross-examination, McDonald admitted that he and Wedlow had fought close to the date of Wedlow's death. He stated that Wedlow had struck him in the head with a bottle.

Following McDonald's testimony, the State presented evidence of four statements given by Lavold via stipulated testimony from two assistant State's Attorneys and one police officer. It was stipulated that if Assistant State's Attorneys Pomaro and Krasny were called, they would testify that Lavold gave the following statement. On the evening of October 16, 1975, he drove to 950 Hicks Road in his truck. He knocked on the front door and then waited briefly before knocking on the bedroom window. Wedlow appeared in the window and motioned for him to wait a moment. After Wedlow opened the door and let him in, Lavold asked Wedlow if he had anything to drink. Wedlow stated that he did not, but that they could go buy something at the Donkey Inn, which was nearby. After Wedlow got fully dressed, they got in Lavold's truck and drove to the Donkey Inn. After purchasing a six pack, they returned to the house. Wedlow went down the hall and appeared to be talking to someone in the bedroom. When Wedlow returned, he pointed upstairs indicating that someone was up there. He then walked into the kitchen area and was mumbling something, but Lavold wasn't sure if he was talking to himself or someone else. Lavold stated that at this point he became uneasy about all the people in the house, because he did not know who they were and he thought something might happen. So, he announced that he was going to leave and then went to his truck and drove away.

In a separate statement given to Detective Smith while his attorney was present, Lavold related essentially the same story he had told to Pomaro and Krasny. However, he stated that when he became uneasy, he asked Wedlow who was in the house and Wedlow

stated "Bill," and pointed toward the bedroom. Lavold explained that he and Bill had had problems in the past, including fist fights. Lavold did not wish to remain in the same house with him, so he got up and left. He stated that Wedlow was still alive when he left.

In a subsequent statement to Pomaro and Krasny, Lavold stated that when he left the house on the evening of October 16, 1975, his truck would not start. So, he came back toward the house, and upon entering through the basement door, he observed a sandy-haired person stabbing Wedlow. He then ran back to the truck, which started immediately, and went home.

In a final statement given to Detective Smith, Lavold stated that he had gone into the basement with Wedlow to look at the oil tanks. He then walked up the stairs, through the living room and out the front door in order to retrieve a monkey wrench from his truck. He then went back into the basement through the outside door, which was open. After he entered the basement with the wrench to check the oil tank, he came up inside the basement steps to the living room instead of leaving through the outside door.

We note that in closing argument the State made reference to additional evidence which was heard at an earlier portion of the discharge hearing held in January 1984. Specifically, the State directed the court's attention to testimony from the fire department concerning the condition of the basement and the condition of Mr. Wedlow. The State also referred the court to the autopsy report indicating the cause of death and the condition of Wedlow's body. This portion of the transcript was not included in the record on appeal. The defendant has the burden of providing a complete record for review, and if the record on appeal is incomplete, the reviewing court will indulge every reasonable presumption favorable to the trial court's judgment. See *People v. Blake* (1985), 130 Ill. App. 3d 948, 956; *People v. Rockett* (1967), 85 Ill. App. 2d 24, 31.

We do not agree with Lavold's contention that the discharge hearing was a "sham." McDonald testified that he heard Lavold and Wedlow go down into the basement together shortly before Wedlow's death. He then heard a grunting noise come from the basement which he testified sounded like Wedlow. Next, he heard someone run from the basement and upon looking out the window he saw that it was Lavold. Moments later, an explosion occurred in the basement and the house began filling with smoke. Viewing the evidence in its entirety, we find that it was sufficient to prove Lavold guilty of murder and arson beyond a reasonable doubt.

■ Lavold next argues that on numerous occasions both the prosecution and the court solicited hearsay evidence from the State's

witness "on substantive issues of guilt and identification." We note that, in his brief, Lavold has failed to identify any specific instances of hearsay. Instead, he has merely listed many pages of the record where hearsay is alleged to have occurred. We have examined each of the pages and although we find some hearsay, we consider the hearsay evidence elicited to be harmless. Accordingly, we find Lavold's contention to be without merit.

Next, Lavold directs our attention to comments from the court which he argues indicate that the court improperly based its conclusion that he was not entitled to acquittal solely on hearsay evidence. In response to a hearsay objection by defense counsel, the court stated:

> "I know it is [hearsay] and everything is [sic] this case is hearsay testimony. I have to consider hearsay because I have no better testimony with reference to this matter. I will note your objection and overrule."

■ Although the court's comment was better left unsaid, it cannot be construed as proof that there was no competent evidence to support the court's conclusion that Lavold was not entitled to acquittal. The record belies such a conclusion. As we have outlined above, the State presented sufficient competent evidence to demonstrate beyond a reasonable doubt that Lavold was responsible for the death of Wedlow.

Next, Lavold contends that the court-appointed counsel was so grossly ineffective that Lavold was denied any assistance of counsel at his discharge hearing. He argues that counsel was ineffective because: (1) he failed to make a motion to suppress statements Lavold made to the police, and instead actually stipulated to these statements; (2) he failed to object to hearsay evidence; (3) he failed to present any witnesses or evidence for Lavold, although Lavold claimed to have alibi witnesses; and (4) he failed to file an appeal from the discharge hearing or fitness hearing. We disagree.

Whether a defendant has been given effective assistance of counsel is to be determined under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 524-27. A defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the fact finder would have reached a different result. *Strickland*, 466 U.S. at 687-95, 80 L. Ed. 2d at 693-98, 104 S. Ct. at 2064-68.

■ First, Lavold offers no basis upon which his statements to the police might have been suppressed. Second, as we discussed above,

none of the alleged hearsay violations were of any substance. Third, Lavold has failed to bring to our attention any evidence whatsoever which counsel might have presented in his defense at the discharge hearing. Finally, we find that counsel's failure to appeal from the discharge hearing or Lavold's initial fitness hearing cannot support a claim for ineffective assistance. As we discussed above, sufficient evidence was presented at the discharge hearing to support the conclusion that Lavold was responsible for Wedlow's death. Likewise, the evidence in the record overwhelmingly indicates that Lavold was and continues to be unfit for trial.

■ Lavold also asserts that the court improperly discharged appointed counsel prior to the expiration of his extended treatment period, thereby leaving him with no counsel to seek his release from the Department of Mental Health. We do not agree. Lavold was represented by assistant public defenders in both his quest for *habeas corpus* relief and his statutory fitness hearing at the expiration of his extended treatment period. Although there was a delay between the time when his treatment expired and his statutory hearing was held, the delay was primarily occasioned by the court's miscalculation of the appropriate treatment period and not a lack of representation.

### III

Lavold next contends that he was denied effective assistance of counsel at the hearing on his *habeas corpus* petition. He argues that counsel was ineffective because: (1) he failed to investigate Lavold's claim that he had demanded a jury to determine his fitness to stand trial; (2) he failed to investigate Lavold's claim of impropriety in the court's appointment of counsel for the discharge hearing; and (3) he failed to argue that court-appointed counsel for the discharge hearing was ineffective. Again, we find Lavold's contentions to be without merit.

■ First, Lavold has not included the transcript of his fitness hearing in the record on appeal, so we have no way of determining whether a demand for a jury was ever made. It is the defendant's burden to provide a complete record on appeal, and any doubt arising from the incompleteness of the record will be resolved against the defendant. (*People v. Odumuyiwa* (1989), 188 Ill. App. 3d 40, 45; *People v. Doto* (1977), 53 Ill. App. 3d 62, 64.) Second, Lavold's claim that there was impropriety in the court's appointment of counsel for the discharge hearing is unsupported. Lavold directs our attention to his "offer of proof" on this issue:

> "One thing about him. You hired him from a building that you worked in also, and I feel it was criminal collusion, the fact that it

> exists there between you and this man, that is too close to a relationship for me to take him and use him as assistance of counsel, without him working too closely with you, in being able to have him as defense counsel."

In our view, the lack of any competent evidence of collusion between defense counsel and the trial judge, coupled with the fact that Lavold had been diagnosed as a paranoid schizophrenic, amply explains why counsel at the *habeas* hearing did not investigate Lavold's claim of impropriety. Finally, counsel at the *habeas* hearing was not ineffective for failing to argue that court-appointed counsel at the discharge hearing was ineffective. We have already determined that there was no basis for such a claim.

Next, Lavold argues that he was denied due process and effective assistance of counsel on August 11, 1989, when assistant public defender Thomas N. Moore III filed a "Motion for Hearing Following Treatment Under Section 104—25," instead of a petition for *habeas corpus*. He argues that on August 11, 1989, he was being held unlawfully because his treatment period had expired and no attempt had been made to civilly commit him. Therefore, he argues that the court should have treated Moore's motion as a petition for *habeas corpus* and released him. We disagree.

■ Section 104—25(g)(3) does provide that "[i]f the defendant is not committed pursuant to this Section, he or she shall be released." (725 ILCS 5/104—25(g)(3) (West 1992).) As we discussed above, we do not read this statute to authorize automatic release of unfit defendants as soon as their treatment period has expired. Rather, the statute requires that an appropriate hearing be held to determine whether a defendant remains unfit, and if so, whether he is subject to involuntary commitment. At the time Moore's motion was filed, no such hearing had been held. Thus, both the assistant public defender and the trial judge were attempting to follow the appropriate statutory procedures, albeit in a delayed fashion. In our view, the statute does not contemplate that where there is a delay in providing the appropriate hearing, no hearing will be held and the defendant will simply be released. (*Cf. In re Nau* (1992), 153 Ill. 2d 406.) Since we have concluded that Lavold was not entitled to release simply because there was a delay in providing the appropriate proceedings, no error was committed either when defense counsel brought a motion for a hearing instead of a *habeas* petition, or when the trial judge treated the motion as one for a hearing instead of a *habeas* petition.

## IV

■ Finally, Lavold contends and the State concedes that the trial judge miscalculated the period of time for which Lavold remains subject to the jurisdiction of the criminal court. The trial judge held that Lavold would be subject to the criminal court's jurisdiction for 60 years and determined that the period would end in the year 2035. The trial court issued this order in 1990 and at that time the maximum sentence for first degree murder was 60 years. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(a) (now 730 ILCS 5/5—8—1(a)(1)(a) (West 1992)).) However, Lavold was entitled to a hearing following treatment as early as August 11, 1987, and at that time the maximum sentence for first degree murder was only 40 years. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a), amended by Pub. Act 85—902 § 1, eff. January 1, 1988.) The 40-year term properly began to run from the date of the original finding of unfitness to stand trial. (*Rasgaitis*, 222 Ill. App. 3d 855.) Lavold was initially found unfit in August of 1981. Therefore, the criminal court could only retain jurisdiction through August of 2021. Accordingly, the court's order is vacated and remanded with directions to enter the correct period of criminal court jurisdiction. In all other respects, the decision is affirmed.

Affirmed in part; vacated in part and remanded with directions.

JUSTICE GORDON, specially concurring:

I fully concur with the well-reasoned decision of the majority, but my concurrence is a reluctant one with respect to the issues raised by the State's delay of almost three years in proceeding with the hearing required under section 104—25(g)(2) of the Code of Criminal Procedure. 725 ILCS 5/104—25(g)(2) (West 1992).

Notwithstanding the "not not guilty" finding in 1984 under section 104N25(a), defendant's ultimate guilt on the substantive criminal charges has not been determined. (See *People v. Rink* (1983), 97 Ill. 2d 533, 543, 455 N.E.2d 64 ("[t]he question of guilt is to be deferred until the defendant is fit to stand trial").) Yet defendant has been and is being detained in a penitentiary at Chester, albeit in its mental health facility under the aegis of the Department of Mental Health.

Although the standards for commitment under the section 104.25(g)(2) are presumably the same as those under the Mental Health and Developmental Disabilities Code (405 ILCS 5/1—100 *et seq.* (West 1992); *People v. Polachek* (1984), 128 Ill. App. 3d 200, 205, 470 N.E.2d 584), the fact is that evidence of the commission of the crime for which defendant was found unfit to stand trial may be

considered in determining whether defendant is to remain institutionalized. Moreover, that determination is made by the court exercising criminal jurisdiction. See *People v. Polachek*, 128 Ill. App. 3d at 205.

The comprehensive scheme of procedures for criminal defendants found unfit to plead or stand trial (725 ILCS 5/104—10 *et seq.* (West 1992)) culminates in a procedure under section 104—25(g)(2) which permits involuntary detention for a period equal to the maximum sentences to which defendant would have been subject if convicted. 725 ILCS 104—25(g)(2) (West 1992).

Manifestly, these procedures must be implemented with caution and vigilance. Otherwise, they can be transmuted through lax enforcement into devices for indefinite detention without trial. One must not lose sight of the fact that they are designed to provide a means of enhancing and safeguarding the right of a defendant while unfit to defend himself in a criminal prosecution without endangering the public safety. Consequently, the delay by the State of almost three years in providing a fitness hearing required under section 104—25 (g) should not be forgiven lightly, even when, as here, there was no showing of substantial prejudice.

Yet it is relatively clear that, under the present language of section 104—25(g), no loss of jurisdiction results from such delay. All that the current act provides is that "[i]f defendant is not committed pursuant to this Section he or she shall be released." (725 ILCS 104—25(g)(3) (West 1992).) The focus of this provision is not upon the timeliness of the commitment proceeding, but rather upon the ultimate occurrence of the hearing and determination of unfitness. This language stands in contrast to the provision under section 3—813 of the Mental Health and Developmental Disabilities Code which states, "If no petition is filed prior to the expiration of the initial order, the patient shall be discharged." (405 ILCS 5/3—813 (West 1992).) Under section 3—813, the Act specifically addresses the timeliness factor and provides for discharge in the event of delay. (See *In re Hatala* (1990), 200 Ill. App. 3d 163, 558 N.E.2d 694; *In re Walker* (1990), 200 Ill. App. 3d 159, 558 N.E.2d 691.) Yet even under the latter provision, our supreme court in *In re Nau* (1992), 153 Ill. 2d 406, 607 N.E.2d 134, was reluctant to mandate a release for a one-day delay. Instead the majority decision in that case appears to have temporized the requirement of timeliness by finding waiver and by proceeding to determine whether there was any resultant prejudice, a determination that would have been superfluous if, in fact, the defendant were truly bound under the waiver doctrine.

I am also compelled to reject the possible contention that as of the date upon which defendant's extended treatment expired, the

presumption of defendant's fitness was restored and resurrected. Under this approach, the time limitation under the speedy trial act (725 ILCS 5/103—5 (West 1992)) would commence running as of that date and, as a result of the extended delay in proceeding with any further fitness hearing, the defendant would be entitled to a complete discharge under the term limitations of that act. (725 ILCS 5/103—5 (West 1992).) This contention was expressly rejected in the well-reasoned opinion in *People v. Cole* (1978), 66 Ill. App. 3d 210, 383 N.E.2d 613, stating:

> "Our statutory protection of this right, section 103—5, states that the time period during which an accused must be tried tolls during the period when he is unfit to stand trial. George Cole was found unfit. While clearly improper, the fact that a review hearing was not held on schedule does not, with respect to section 103—5, disturb the presumption of defendant's continuing unfitness. Therefore, the 120-day period provided by section 103—5 did not resume until defendant was found fit to stand trial on January 7, 1977." *People v. Cole*, 66 Ill. App. 3d at 212.

Clearly less than total adherence to the statutory requirements imposed upon unfitness proceedings can result in the indefinite and unwarranted detention of a defendant caught up within the reach of those proceedings, without a trial on the merits or the alternate safeguard of periodic hearings imposed by the statutory scheme to periodically test his unfitness. It would therefore make sense to build in teeth for the prompt enforcement of the statutory procedural requirements, at least to the extent of requiring that those defendants who are not heard promptly must be discharged, which would then require a new civil commitment proceeding to be initiated for any further institutionalization. This is consonant with the position of the dissent in *In re Nau*, wherein Justice Freeman stated:

> "Some might argue that following those steps amounts to an empty exercise. Quite the contrary is true. Adherence to the procedures established by the Code is the only way to ensure that the efforts taken to subject individuals to involuntary admission in a hospital or mental health facility are properly scrutinized. And only through such adherence are the Code's goals and the liberty interests implicated in involuntary admission procedures simultaneously honored." *In re Nau*, 153 Ill. 3d at 435.

Nevertheless, in view of the permissive language of the Act itself and the apparent, although not conclusive, thrust of the majority opinion in *In re Nau* (involving language more explicit and categorical than that under section 104—25(g) (725 ILCS 5/104—25(g) (West 1992))), I feel currently compelled to concur with the majority notwithstanding my reluctance to permit a virtual three-year delay in the hearing process to pass without consequences to the State.

JUSTICE McNULTY, concurring in part, specially concurring in part and dissenting in part:

## I. SPECIALLY CONCURRING

I concur, reluctantly, with the majority, that a delay of almost three years beyond the time period required by section 104—25(g)(2) of the Code of Criminal Procedure (725 ILCS 5/104—25 (West 1992)) in proceeding with a fitness and discharge hearing does not require release of defendant from custody under the current state of the law in Illinois.

Although the standards of commitment under section 104—25(g)(2) appear to be the same as those under the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1—100 *et seq.* (West 1992)), there are two important differences. First, evidence of the commission of a crime for which a defendant was found unfit to stand trial may be considered in determining whether defendant must remain institutionalized for further treatment. Second, the determination is made by a court exercising jurisdiction under the criminal code, a statute with far different objectives and consequences than those of the Mental Health Code. Moreover, these procedures for criminal defendants permit involuntary commitment for a period of time equal to the maximum sentence to which defendant would have been subjected had he been convicted. In this case that time period is 40 years. If defendant had been convicted and sentenced to a maximum term, if good time and other sentence reduction credits are considered, he would likely be eligible for parole or, if not, nearly so at the present time. Therefore, his potential involuntary commitment under the criminal code because of the misfortune of unfitness to stand trial can greatly exceed that to which he could be subjected if tried and convicted of the charges. For that reason it is imperative that the procedural and constitutional safeguards embodied in the criminal code be scrupulously followed. However, it is apparent that this was not done in this case and other cases cited in both the majority and specially concurring opinions. I, therefore, agree with the specially concurring opinion that some mechanism needs to be provided for enforcement of the statutory procedural requirements regarding timely hearings for unfit defendants. Discharge of unfit defendants who have not had timely hearings from criminal code jurisdiction is one such mechanism which would then require a new civil commitment procedure to determine if further institutionalization is warranted. If upon review of unfitness cases coming before this court a pattern of delay in prompt fitness hearings appears to be the rule rather than the

exception, one could then reasonably conclude in the future that discharge of such defendant from criminal code jurisdiction is the only way in which constitutional procedural guarantees can be assured.

## II. CONCURRING IN PART AND DISSENTING IN PART

I dissent from the majority conclusion that defendant received effective assistance of counsel at his discharge hearing concluded on May 17, 1984. While I would not characterize the hearing as a "sham" as defendant does in his brief, in my view, his counsel did not assert and pursue all of the procedural safeguards and defenses to which defendant was constitutionally entitled.

After the murder had been committed, defendant was taken into custody, given *Miranda* warnings and interrogated by a police officer and then by two assistant State's Attorneys. Because of the great potential for protracted institutionalization of an unfit defendant as established by this case and as above set forth, it was imperative that defense counsel vigorously challenge the State's evidence against defendant at this discharge hearing by all procedural avenues reasonably available. I do not believe this was done in the case at bar.

In all, four statements of defendant came in by way of stipulation. Although defendant did not admit committing the crime, these combined statements placed him at the scene, in the company of the deceased and witnessing the crime, thereby in part corroborating the statement of the State's only other witness, William McDonald.

Defendant's counsel not only failed to make a motion to suppress statements he made to the assistant State's Attorneys and police, but instead stipulated to their introduction into evidence.

Other than the statements of defendant, the only witness against defendant was William McDonald, whose testimony also put defendant at the scene conversing with deceased. McDonald, however, did not actually observe the two together or see the commission of the crime.

The record reveals that the trial judge fully recognized that McDonald left much to be desired as a witness against defendant, not only because he had criminal convictions in his background, but also because McDonald, himself, had an altercation with the deceased shortly before his death, thus giving him a motive to point the finger of guilt for the crime elsewhere. It is clear, however, that the trial judge relied heavily on defendant's statements to law enforcement officials corroborating McDonald's testimony putting defendant at the scene of the crime in determining that the State had met its burden in establishing defendant's guilt beyond a reasonable doubt.

The majority opinion declares that defendant offered no legal

basis upon which counsel could have moved to suppress the statements. Here we have a defendant who has remained unfit for trial on the charges against him for almost 15 years after numerous examinations by several doctors. The trial judge who conducted the fitness hearing in 1984 which is part of the record on appeal refused to allow defendant to waive the assistance of counsel because he did not deem the defendant sufficiently competent mentally to make that decision.

In light of defendant's mental health history and his bizarre behavior both in and out of court replete in this record, it is reasonable to conclude that a competent attorney would have filed a motion to suppress on the basis that this defendant was competent neither to understand nor to waive the constitutional rights to which he was entitled under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, before being subjected to custodial interrogation. If counsel had succeeded in suppressing these statements and considering the trial judge's expressed concerns about the credibility of McDonald as the State's sole witness against defendant, one cannot conclude from this record that the trial judge would have found the charge against defendant proved beyond a reasonable doubt. I, therefore, conclude that counsel's failure to file such a motion and to appeal the decision of the court that the evidence against defendant was sufficient to prove him guilty beyond a reasonable doubt was both incompetent and prejudicial under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. I would therefore reverse and remand for a new fitness hearing.

## III. SPECIALLY CONCURRING

Since I would reverse and remand for a new fitness hearing on direct review based upon incompetence of counsel for the reasons set forth in II above, this would obviate the necessity to raise the issue again in the *habeas corpus* hearing.

## IV. CONCURRING

I concur with the majority that the period of criminal court jurisdiction expires in August of 2021.